FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTH COUNTY COMMUNITY
ALLIANCE, INC.,
    *Plaintiff-Appellant,*

   v.

KEN SALAZAR, Secretary of the
United States Department of the
Interior; DEPARTMENT OF INTERIOR;
PHILIP HOGEN, Chairman of the
National Indian Gaming
Commission; NATIONAL INDIAN
GAMING COMMISSION,
    *Defendants-Appellees.*

No. 07-36048

D.C. No.
CV-07-01098-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
March 11, 2009—Seattle, Washington

Filed July 15, 2009

Before: William A. Fletcher, Ronald M. Gould and Richard
C. Tallman, Circuit Judges.

Opinion by Judge William A. Fletcher;
Partial Concurrence and Partial Dissent by Judge Gould

8903

## COUNSEL

Brian D. Amsbary, Richard M. Stephens, Groen Stephens & Klinge, LLP, Bellevue, Washington, for the appellant.

Rebecca Shapiro Cohen, Brian Kipnis, Office of the United States Attorney, Seattle, Washington, Aaron P. Avila, Robert Lundman, Ronald J. Tenpas, U.S. Department of Justice, Washington, D.C., for the appellees.

## OPINION

W. FLETCHER, Circuit Judge:

The North County Community Alliance, Inc., ("Alliance") brought suit against the National Indian Gaming Commission ("NIGC"), the Department of Interior, and those agencies' principal officers (collectively, "Appellees"). The Alliance claims that the NIGC's failure to make an "Indian lands" determination either before approving the Nooksack Indian Tribe's ("Nooksacks' ") gaming ordinance (the "Ordinance") in 1993, or before the Nooksacks licensed and began constructing the Northwood Crossing Casino ("Casino") in 2006, violated the Indian Gaming Regulatory Act ("IGRA"). The Alliance also claims that Appellees violated the National Environmental Policy Act ("NEPA") by failing to prepare an environmental impact statement ("EIS") in connection with construction of the Casino.

We hold that the Alliance's challenge to the NIGC's 1993 approval of the Ordinance, insofar as it relates to the licensing and construction of the Casino, is not time-barred. We hold on the merits that the NIGC did not have a duty under IGRA to make an Indian lands determination in 1993 before approving the Nooksacks' non-site-specific proposed gaming Ordinance. We also hold that the NIGC did not have a duty under IGRA to make an Indian lands determination in 2006 when the Nooksacks licensed and began construction of the Casino pursuant to the approved Ordinance. Finally, we hold that there was no violation of NEPA.

## I. Background

The Nooksack Indian Tribe is a federally recognized Indian tribe with a reservation in northwestern Washington State near the Canadian border. Beginning in the early 1990s, the Nooksacks sought to engage in tribal gaming.

IGRA requires Indian tribes to receive NIGC's approval of a gaming ordinance before engaging in "class II" or "class III" gaming. 25 U.S.C. § 2710(b), (d). Class II gaming includes bingo and card games except for "banking" card games like baccarat, chemin de fer, and blackjack. *Id.* § 2703(7). Class III gaming includes banking card games and slot machines. *Id.* § 2703(8). The Nooksacks submitted a proposed gaming Ordinance to the NIGC, which the NIGC approved in 1993.

Since shortly after the approval of the Ordinance, the Nooksacks have operated a class III gaming facility on reservation land in Deming, Washington. That facility is not at issue.

The Ordinance does not identify any specific site or sites where gaming might take place. With respect to class II gaming, it provides only that the Nooksack Gaming Commission "shall issue a separate license to each place, facility, or location on Indian lands where Class II gaming is conducted under this ordinance." In 2006, pursuant to the Ordinance, the Nooksacks licensed and began constructing the Casino as a class II gaming facility.

The Casino is located on a twenty-acre parcel owned by the Nooksacks about one-half mile south of the Canadian border and about thirty-three miles by road from the Nooksack reservation. According to the Alliance's complaint, this "parcel of largely undeveloped rural land is mostly surrounded by vacant and non-Indian farming lands and woodlands, is situated near Lynden, Washington[,] and is served by . . . highways, public services and infrastructure provided by Whatcom County and the State of Washington."

The Alliance is a non-profit organization whose stated goal is to protect the environment. According to the complaint, its members include residents and property owners near the Casino site, as well as some members of the Nooksack Tribe.

In July 2007, the Alliance filed suit in federal district court against Appellees.

IGRA limits tribal gaming to locations on "Indian lands" as defined in 25 U.S.C. § 2703(4). The Alliance claims that the NIGC violated IGRA by failing to determine whether the land on which the Casino is built is Indian land, either in 1993 when it approved the Ordinance or in 2006 when the Nooksacks licensed and began constructing the Casino. The Alliance also claims that Appellees violated NEPA by failing to prepare an EIS in connection with the construction of the Casino.

The district court dismissed the Alliance's suit with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Alliance timely appealed.

## II.   Standard of Review

We review de novo questions of law raised in dismissals under Rules 12(b)(1) and 12(b)(6). *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1156 (9th Cir. 2007) (Rules 12(b)(1) and 12(b)(6)); *Granite Rock Co. v. Int'l Bhd. of Teamsters, Freight Constr. Gen. Drivers, Warehousemen & Helpers, Local 287 (AFL-CIO)*, 546 F.3d 1169, 1172 (9th Cir. 2008) (questions of law). This court must accept "all allegations of material fact as true and construe them in the light most favorable" to the Alliance. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). With respect to NEPA, "we must ensure that the agency has taken a 'hard look' at the environmental consequences" of proposed actions that constitute "major Federal actions" under 42 U.S.C. § 4332(C). *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

## III.   Discussion

We address the following questions. First, does the statute of limitations bar the Alliance's challenge to the NIGC's 1993

approval of the Ordinance? Second, was the NIGC required to determine the status of the land on which the Casino could or would be built, either when it approved the Ordinance in 1993 or before the licensing and construction of the Casino in 2006? Third, did Appellees violate NEPA by failing to prepare an EIS before the licensing and construction of the Casino?

## A.    Statute of Limitations

**[1]** The applicable statute of limitations provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a).

The NIGC approved the Nooksacks' Ordinance in 1993. The construction of the Casino began in 2006. The Alliance filed suit in 2007. The statute of limitations clearly does not bar the Alliance's claim that the NIGC was required to determine in 2006, before licensing and construction, whether the Casino would be located on Indian lands. The question is whether the statute of limitations bars Alliance's claim that the NIGC was required to determine in 1993, when it approved the Ordinance, the status of the land on which the Casino is now located. For the reasons that follow, we conclude that the statute of limitations does not bar that claim.

Our decision in *Wind River Mining Corp. v. United States* ("*Wind River*"), 946 F.2d 710 (9th Cir. 1991), guides our analysis. In *Wind River*, the Bureau of Land Management ("BLM") had classified certain federal lands as Wilderness Study Areas ("WSAs") in 1979. Mining was forbidden within a WSA. In 1986 and 1987, the Wind River Mining Corporation ("Wind River") asked the BLM to declare that its decision to create WSA 243 was invalid because that particular WSA was not "roadless" as required by statute. The BLM denied the request. In 1987, the Interior Board of Land Appeals denied Wind River's administrative appeal.

**[2]** Wind River filed suit in 1989 alleging that the BLM's 1979 action in creating WSA 243 was ultra vires. We permitted Wind River's claim to proceed:

> If . . . a challenger contests the substance of an agency decision as exceeding constitutional or statutory authority, the challenger may do so later than six years following the decision by filing a complaint for review of the adverse application of the decision to the particular challenger. Such challenges, by their nature, will often require a more "interested" person than generally will be found in the public at large. For example, assuming that Wind River's challenge to the designation of WSA 243 is merited, no one was likely to have discovered that the BLM's 1979 designation of this particular WSA was beyond the agency's authority until someone actually took an interest in that particular piece of property, which only happened when Wind River staked its mining claims. The government should not be permitted to avoid all challenges to its actions, even if *ultra vires*, simply because the agency took the action long before anyone discovered the true state of affairs.

*Id*. at 715.

In *Artichoke Joe's California Grand Casino v. Norton* ("*Artichoke Joe's*"), 278 F. Supp. 2d 1174 (E.D. Cal. 2003), plaintiffs challenged the Department of Interior's decision to grant federal recognition of the Lytton Rancheria of California as an Indian tribe, even though the challenge was brought more than six years after the recognition occurred. Applying *Wind River*, the district court held that plaintiffs' challenge was not time-barred. It wrote:

> Plaintiffs' claim concerning recognition of Lytton as a tribe is a substantive challenge to the Secretary's recognition decision. Further, when the Secretary

made the decision to . . . grant Lytton federal recognition in 1991, plaintiffs could have had no idea that Lytton's tribal status would affect them [by leading to tribal gaming nearby].

278 F. Supp. 2d at 1183.

**[3]** Like the plaintiffs in *Wind River* and *Artichoke Joe's*, the Alliance argues that the NIGC acted ultra vires in approving the Nooksacks' proposed Ordinance in 1993 without first making an Indian lands determination for locations where gaming would be permitted under the Ordinance. "[N]o one was likely to have discovered" that the NIGC's approval was "beyond the agency's authority until someone actually took an interest in" it. *Wind River*, 946 F.2d at 715. The Alliance "took an interest" in 2006 when construction of the Casino began near some of its members' properties. The Alliance "could have had no idea" in 1993 that the NIGC's approval of the Nooksacks' Ordinance "would affect them" in 2006 by leading to construction of a casino thirty-three miles from the Nooksack reservation. *See Artichoke Joe's*, 278 F. Supp. 2d at 1183.

**[4]** We therefore conclude that the statute of limitations does not bar the Alliance's claim that NIGC was required to determine in 1993 the "Indian lands" status of the parcel on which the Casino was built in 2006.

### B.   NIGC Duty to Determine Indian Lands Status

The Alliance claims that the NIGC was required to determine the status of the land on which the Casino could or would be built, either in 1993, when it approved the Ordinance, or in 2006, before the licensing and construction of the Casino. The Alliance contends that the parcel on which the Casino is built is not "Indian land" within the meaning of 25 U.S.C. § 2703(4). However, this question is not before us, as the Alliance acknowledges. Rather, the question before us is

whether IGRA required the NIGC to determine the Indian lands status of the Casino parcel in 1993 or 2006.

### 1.   Subject Matter Jurisdiction

We first address our jurisdiction to review the 1993 action, and 2006 inaction, of the NIGC. IGRA specifies various circumstances in which federal courts may review the decisions of the NIGC: "Decisions made by the Commission pursuant to section[ ] 2710 [tribal gaming ordinances], . . . of this title shall be final agency decision for purposes of appeal to the appropriate Federal district court pursuant to chapter 7 of Title 5." 25 U.S.C. § 2714. The NIGC's 1993 approval of the Nooksacks' Ordinance was a decision "made by the Commission pursuant to section[ ] 2710." We therefore conclude that we have jurisdiction under § 2714 to review that decision. That is, we have jurisdiction to determine whether the NIGC was required, as part of its approval of the Ordinance in 1993, to make an Indian lands determination with respect to the parcel on which the Casino is located.

The Administrative Procedure Act ("APA") provides that a federal court has jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Appellees appear to concede that we have jurisdiction under this section. We agree with Appellees' apparent concession and conclude that we have jurisdiction. *See Confederated Tribes of the Umatilla Indian Reservation v. Bonneville Power Admin.*, 342 F.3d 924, 930 (9th Cir. 2003) (for judicial review under § 706(1), petitioners "must at least show 'agency recalcitrance . . . in the face of clear statutory duty or . . . of such magnitude that it amounts to an abdication of statutory responsibility' " (ellipses in original)).

### 2.   Merits

#### a.   NIGC's Approval of the Ordinance in 1993

It is undisputed that IGRA authorizes tribal gaming only on "Indian lands" as defined in 25 U.S.C. § 2703(4). IGRA pro-

vides that Congress finds that "Federal law does not provide clear standards or regulations for the conduct of gaming *on Indian lands*." 25 U.S.C. § 2701(3) (emphasis added). IGRA establishes "independent Federal regulatory authority" and "Federal standards" for gaming "*on Indian lands*." *Id.* § 2702(3) (emphasis added). IGRA provides that an Indian tribe can engage in "class II gaming *on Indian lands* within such tribe's jurisdiction" if certain conditions are met. *Id.* § 2710(b)(1) (emphasis added). Indian tribes are required to issue separate licenses "for each place, facility, or location *on Indian lands* at which class II gaming is conducted." *Id.* (emphasis added). IGRA provides that class III gaming "shall be lawful *on Indian lands* only" if certain conditions are met. *Id.* § 2710(d)(1) (emphasis added).

**[5]** Tribal gaming on non-Indian lands is not authorized by or regulated under IGRA. A notice of final rulemaking published by the NIGC in February 2008 stated that "IGRA requires that all gaming take place *on 'Indian lands'* " and "[g]aming that does not take place on Indian lands is subject to all state and local gambling laws and federal laws apart from IGRA." Facility License Standards, 73 Fed. Reg. 6019, 6022 (Feb. 1, 2008) (emphasis added).

The Chairman of the NIGC is required to approve any proposed tribal ordinance concerning class II gaming if the proposed ordinance meets certain specified conditions. 25 U.S.C. § 2710(b)(2) ("The Chairman *shall* approve any tribal ordinance . . . if such ordinance . . . provides . . . ." (emphasis added)). For example, the proposed ordinance must provide (subject to one exception not relevant here) that the tribe will have "the sole proprietary interest and responsibility for the conduct of any gaming activity"; that the net revenues from the gaming activity will be used only for certain specifically described purposes, such as funding tribal government and providing for the general welfare of the tribe; that there will be "annual outside audits"; and that the construction, maintenance, and operation of the gaming facility will be conducted

in such a manner as to protect the environment and the public health and safety. *Id.* § 2710(b)(2)(A)-(C), (E); *see also* 25 C.F.R. §§ 522.4, 522.6.

**[6]** There is no explicit requirement in IGRA that, as a pre-condition to the NIGC's approval, a proposed ordinance identify the specific sites on which the proposed gaming is to take place. IGRA specifies only that, pursuant to an approved ordinance, "[a] separate licence issued by the Indian tribe shall be required for each place, facility, or location on Indian lands at which class II gaming is conducted." 25 U.S.C. § 2710(b)(1). However, the Alliance argues that NIGC's duty to make an Indian lands determination before approving an ordinance is implicit in IGRA.

The Alliance points out that IGRA provides that the NIGC "shall approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming *on the Indian lands* within the tribe's jurisdiction" if it satisfies the conditions referred to above. *Id*. § 2710(b)(2) (emphasis added); *see also id.* § 2710(d)(2)(B) (same for approval of class III gaming ordinances). The Alliance argues that the italicized language not only limits the ordinances that the NIGC can approve to those that permit gaming on Indian lands, but also imposes on the NIGC an obligation to make an Indian lands determination when it approves a proposed ordinance. Implicit in the Alliance's argument is a contention that a proposed gaming ordinance must specifically identify all the sites at which gaming could or would take place.

In support of its argument, the Alliance cites *Citizens Against Casino Gambling in Erie County v. Kempthorne* ("*Erie County*"), 471 F. Supp. 2d 295 (W.D.N.Y. 2007). Plaintiff in *Erie County* challenged the NIGC's decision to approve a tribal gaming ordinance without first making an "Indian lands" determination. The district court in *Erie County* wrote:

Whether proposed gaming will be conducted *on Indian lands* is a critical, threshold jurisdictional determination of the NIGC. Prior to approving an ordinance, the NIGC Chairman must confirm that the situs of proposed gaming is Indian lands. If gaming is proposed to occur on non-Indian lands, the Chairman is without jurisdiction to approve the ordinance.

*Id.* at 323-24. The court held that "the NIGC Chairman has a duty to determine whether a tribe's proposed gaming will occur on Indian lands before affirmatively approving an ordinance." *Id.* at 324.

The gaming ordinance at issue in *Erie County* was different from the Ordinance at issue in this case. The ordinance in that case was a tribal-state compact between the Seneca Nation and the State of New York that was submitted to the NIGC as a proposed class III gaming ordinance. The compact identified three possible sites for class III gaming. It identified the precise location of two of the three sites. It identified the location of the third site more generally as land "in Erie County, at a location in the City of Buffalo to be determined by the [Seneca] Nation." *Id.* at 327. As part of the compact, the State agreed to assist the Seneca Nation in acquiring parcels at two sites, including the generally described site in the City of Buffalo, and to assist the Seneca Nation in achieving Indian land status for the parcels. After the ordinance was approved by the NIGC, the Seneca Nation purchased a specific parcel in Buffalo. Plaintiffs, who objected to gaming on the Buffalo parcel, contended that the Chairman of the NIGC erred "when he approved the Ordinance without making an 'Indian land' determination with respect to property the [Seneca Nation] intended to acquire for gaming purposes." *Id*. at 322. The district court agreed and vacated the NIGC's approval of the ordinance with respect to the Buffalo parcel, remanding to the NIGC for a determination of the Indian lands status of the parcel. *Id.* at 327.

**[7]** We are willing to assume without deciding that the district court in *Erie County* was correct in concluding that the NIGC had an obligation to determine the Indian lands status of the Buffalo parcel when it approved the interstate compact as a gaming ordinance for the Seneca Nation. But the Ordinance in the case before us is quite different from the ordinance at issue in *Erie County*.[1] In the Nooksack Ordinance, no potential gaming sites are identified, either specifically or generally. The only part of the Ordinance that refers in any way to Indian lands is § 56.04.030, which provides that the Nooksack Gaming Commission "shall issue a separate license to each place, facility, or location on Indian lands where Class II gaming is conducted under this ordinance." The letter from the Chairman of the NIGC approving the Nooksack Ordinance stated, "It is important to note that the gaming ordinance is approved for gaming only on Indian lands as defined in the IGRA." But, like the Ordinance itself, the letter identified no potential gaming site, either specifically or generally.

The NIGC states in its brief to us that when a site-specific ordinance is presented for approval it has an obligation to make an Indian lands determination for the specifically identified site or sites. In that circumstance, it makes sense for the NIGC to make an Indian lands determination for the site or sites specifically identified in the proposed ordinance. However, the NIGC contends that it has no obligation to make an Indian lands determination when approving a non-site-specific ordinance.

**[8]** The NIGC contends that the text of IGRA does not oblige a tribe to specify in a proposed ordinance, as a condition of the NIGC's approval, all (or even any) of the sites at which the tribe might conduct class II gaming. Nor can we find such an obligation in the statutory text. Absent such an obligation, it would be absurdly impractical to require the

---

[1]We take judicial notice of the Ordinance and the letter from the NIGC approving it. Both documents are available to the public.

NIGC to make an Indian lands determination as part of its approval of an ordinance. In effect, the NIGC would be required to make an Indian lands determination for all lands that are owned, or could be owned in the future, by the tribe and on which the tribe might wish to conduct gaming.

The Alliance appears to recognize the impracticality of requiring the NIGC to make an Indian lands determination as part of its approval of a non-site-specific ordinance. It argues, in effect, that any proposed ordinance submitted to the NIGC must be site-specific. In support of this argument, the Alliance points to one of the enumerated criteria that a proposed class II gaming ordinance must satisfy. Section 2710(b)(2)(E) states that a proposed ordinance must provide that "the construction and maintenance of *the gaming facility*, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety." 25 U.S.C. § 2710(b)(2)(E) (emphasis added). The Alliance argues that the italicized language necessarily implies that a proposed gaming ordinance must identify specific gaming facilities. We are not convinced. This is the only provision in IGRA that could be read to imply that gaming ordinances must identify specific gaming sites. It is undisputed that in practice most gaming ordinances approved by the NIGC do not identify specific sites. Moreover, if "*the* gaming facility" is meant to be read literally as the Alliance suggests, this implies that each ordinance is limited to a *single* gaming facility. IGRA plainly contemplates otherwise. *See id.* § 2710(b)(1).

**[9]** We conclude that IGRA does not require a tribe to submit a site-specific proposed ordinance as a condition of approval by the NIGC under § 2710(b). We also conclude that the NIGC was not required in 1993, when it approved the Nooksacks' non-site-specific Ordinance, to make an Indian lands determination for the parcel on which the Casino is located.

### b.   NIGC's Failure to Act in 2006

**[10]** In the alternative, the Alliance claims that the NIGC was required to make an Indian lands determination when the Nooksacks licensed and began construction of the Casino in 2006. However, the Alliance points to nothing in the text of IGRA, or in any implementing regulation in effect in 2006, that required the NIGC to make an Indian lands determination when a tribe licensed or began construction of a class II gaming facility already authorized by a non-site-specific ordinance. Nor have we been able to find anything in the text of IGRA, or in the regulations in effect in 2006, so requiring. We therefore conclude that NIGC was under no judicially enforceable obligation to make an Indian lands determination in 2006. *See Confederated Tribes*, 342 F.3d at 930.

### 3.   2008 Regulations

We recognize that IGRA, and its implementing regulations in effect at the times relevant to this suit, operated somewhat awkwardly. A tribe could obtain NIGC approval of a non-site-specific ordinance authorizing class II gaming, and license and build a class II gaming facility pursuant to that ordinance on land that does not constitute Indian land under § 2703(4). If neither the NIGC nor the State initiates a proceeding to enjoin the construction or operation of the facility on the ground that it is not located on Indian land, the tribe could end up operating a class II gaming facility on non-Indian lands in violation of IGRA. We do not say that this happened in this case, for we do not know — and are not asked to decide — whether the Casino is located on Indian lands. But we recognize that because neither the NIGC nor the State has initiated a proceeding seeking to stop the Nooksacks from constructing and operating the Casino, there has not been, and perhaps never will be, any authoritative Indian lands status determination.

In 2008, the NIGC promulgated regulations that ameliorated the awkwardness we have just described. The validity

and proper interpretation of these new regulations is not before us, and we mention them only to point out that the NIGC seems to be aware of the practical difficulties presented under the law and regulations as they existed at the times relevant to this suit. Under newly promulgated 25 C.F.R. § 522.2(i), the NIGC is authorized to require that a tribe submit Indian lands information when submitting a proposed ordinance for approval. That section provides that "[a] tribe shall provide Indian lands . . . documentation that the Chairman [of the NIGC] may in his or her discretion request as needed." Further, newly promulgated 25 C.F.R. § 559, which regulates the licensing of gaming facilities already approved under an ordinance, now furthers the "purpose" of "ensur[ing] that each place, facility, or location where class II or class III gaming will occur is located on Indian lands eligible for gaming[.]" *Id.* § 559.1(a). The regulation requires a tribe to "submit to the Chairman [of the NIGC] a notice that a facility license is under consideration for issuance at least 120 days before opening any new place, facility, or location on Indian lands where class II or class III gaming will occur." *Id.* § 559.2(a). That notice must contain specified information about the location and status of the property on which the facility is to be located, so that the NIGC may determine whether the property is Indian lands eligible for gaming. *See id.*

### 4.   Dissent

The dissent states that we "disregard the most salient fact of this case" — that the Casino "may or may not be on Indian lands." Diss. Op. at 8923. It goes on to state that under our approach, "we may never know whether the casino is on Indian lands, and the North County Community Alliance cannot get judicial review to determine whether the casino is properly on Indian lands or not." *Id.* It is true that we may never get an authoritative determination of the Indian land status of the Casino. But it is not true that we disregard the possibility that an Indian casino might be built on non-Indian

land. We openly acknowledge that this is a possibility. Nor is it true that under our approach there can never be an authoritative administrative or judicial determination of the Indian lands status of a proposed or newly constructed casino.

[11] Both the NIGC and the States have authority to bring proceedings against Indian gaming facilities located on non-Indian land. Under 25 U.S.C. § 2713(b)(1) and (2), the NIGC has the authority to order a closure of "an Indian game for substantial violation of the provisions of this chapter." Such provisions include a requirement that gaming be conducted on Indian lands, as the dissent agrees. Further, if Indian gaming is conducted on non-Indian lands, it is subject to gaming regulations of the State in which the gaming facility is located. If a State believes that an Indian casino is located on non-Indian lands, it may bring an appropriate proceeding in state court to ensure compliance with state law. If the casino is located on non-Indian land and its operation is forbidden under state law, there is nothing in federal law to prevent a state court from enjoining its operation.

[12] We recognize that enforcement or injunctive proceedings by the NIGC or the State are not the same thing as private causes of action brought by an objecting party such as the Alliance. An objecting party may encourage the NIGC or the State to bring such proceedings, but the decision actually to bring a proceeding will be that of the NIGC or the State. For reasons that do not appear in the record, neither the NIGC nor the State has seen fit to bring such a proceeding in this case.

[13] We also recognize that post-construction enforcement or injunctive proceedings against Indian casinos by the NIGC or a State are a less desirable alternative than pre-construction determinations of Indian land status for such casinos. In apparent recognition of this fact, the NIGC has recently promulgated the regulations described above. With the new regulations on the books, it may well turn out that pre-construction

determinations by the NIGC of Indian land status will become the norm for Indian gaming facilities.

**[14]** The question before us is not whether IGRA and the regulations that existed at the times relevant to this suit were ideally suited to resolving, in a timely fashion, the Indian land status for proposed tribal casinos. The question, rather, is whether IGRA and the then-governing regulations required the NIGC to make an Indian lands determination in 1993 when it approved the Nooksacks' proposed non-site-specific Ordinance, or in 2006 before the Nooksacks began construction of the Casino. For the reasons given above, we conclude that the NIGC had no such obligation.

## C.   NEPA

**[15]** The Alliance claims that NIGC's failure to make an Indian lands determination constituted a "major Federal action[ ]" under 42 U.S.C. § 4332(C) requiring environmental review, including preparation of an EIS, under NEPA. We disagree. There has been no major federal action in this case. Therefore, the Appellees had no obligation under NEPA.

## Conclusion

**[16]** We hold that the Alliance's claim that the NIGC was required under IGRA to make an Indian lands determination for the parcel on which the Casino is located is not time-barred. We further hold that the NIGC was not required in 1993 to make an Indian lands determination as part of its approval of the Nooksacks' Ordinance, or in 2006 when the Nooksacks licensed and began construction of the Casino. Finally, we hold that Appellees did not violate NEPA. We therefore affirm the district court's dismissal of the Alliance's complaint under Rule 12(b)(6).

AFFIRMED.

GOULD, Circuit Judge, concurring in part, dissenting in part:

I concur in the majority's opinion Parts I, II, III A, III B 1, III B 2 A, and III C. But I dissent from the majority's conclusions in Part III B 2 B, III B 3, and III B 4 that the NIGC was not required to make an "Indian lands" determination before the casino construction began. I would reverse the district court on this issue. I regret that the majority disregards the most salient fact of this case: The Nooksack Tribe built a casino that may or may not be on Indian lands. The majority acknowledges that we do not know whether it is or not. Maj. op. at 8919. Under the majority's approach, we may never know whether the casino is on Indian lands, and the North County Community Alliance cannot get judicial review to determine whether the casino is properly on Indian lands or not. Because there has never been an Indian lands determination, it remains unclear if the IGRA applies or if local, state and federal regulations apart from the IGRA regime apply.[1]

The majority leaves the casino in legal limbo, stating that whether this casino is on Indian lands is a question that will be litigated only if the NIGC or state authorities choose to exercise their prosecutorial discretion. The majority concludes that the IGRA has authorized this limbo, and that there is nothing for our court to do. But in my view Congress could not have intended the majority's approach when it enacted the IGRA. Consider this hypothetical set of facts that I hope may be illuminating: If an Indian Tribe, after having received approval on a non-site-specific ordinance, bought land in downtown Seattle, under the majority's approach the NIGC would have no duty to stop the tribe from erecting a casino, even if the land clearly did not fall within the statutory definition of Indian lands. *See* 25 U.S.C. § 2703(4). Thus as the

---

[1]If the Nooksack Tribe's casino is not on Indian lands, it is not authorized by the IGRA and all local, state, and federal regulations apart from the IGRA apply. *See* Facility License Standards, 73 Fed. Reg. 6019, 6022 (Feb. 1, 2008).

majority sees IGRA, the NIGC would have no duty to act to prevent construction of a clearly unauthorized casino. The majority notes that the state authorities or the NIGC may act, but they also may not. The citizens neighboring the casino site have no way to ensure that the casino is not built on lands that are not Indian lands. I conclude that Congress would never have intended to leave the Indian lands determination to the discretion of the NIGC and state authorities nor did Congress intend to allow the determination to happen after the gaming facility's construction. That would be a deplorable way to interpret the statute which could easily lead to grave financial problems for an Indian tribe that had the temerity to build a casino on lands that later turned out to not qualify as Indian lands.

The majority's reliance on the text of a single provision of the statute, without consideration of the surrounding provisions, leads it astray. After considering the IGRA as a whole, I conclude that the majority's interpretation of the statute is inconsistent with the statute's explicitly stated intent, its stated purpose, and the necessary assumptions underlying other provisions of the statute. *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94-95 (1993) (answering a statutory construction question "not by a single sentence or member of a sentence, but looking to the provisions of the whole law, and to its object and policy") (internal quotation omitted); *United Savs. Ass'n. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor.").

The majority's holding that the NIGC has no duty to make an Indian lands determination, which would permit Indian tribe gaming to occur anywhere, is contrary to legislative intent and stated purposes. *See Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990) (interpreting the Securities Act in accordance with its purpose). In enacting the IGRA, Congress found there was an absence of "clear standards or regulations for the conduct of gaming *on Indian lands*" and sought to

remedy that absence. *See* Indian Gaming Regulatory Act, Pub. L. No. 100-497 (codified at 25 U.S.C. § 2701(3)) (emphasis added). Congress also noted that "Indian tribes have the exclusive right to regulate gaming activity *on Indian lands*" if the activity is not prohibited by state or federal law. *Id.* § 2701(5) (emphasis added). With these findings Congress could not have intended to create a regime where the NIGC did not have to make Indian lands determinations. Gaming facilities built in the absence of such a determination will thwart the Congressional intent to provide clear standards and regulations of Indian gaming on Indian lands.

Congress also found that gaming is an important means of generating tribal revenue, promoting tribal self-sufficiency and economic development, and these are "principal goal[s] of Federal Indian policy." *Id.* § 2701(4). Allowing the Indian tribe to construct a gaming facility before the tribe knows whether the federal government will recognize it as within its tribal jurisdiction frustrates the goal of promoting tribal economic development and self-sufficiency. If it later became clear that the gaming facility was not on Indian lands, the IGRA would no longer apply, and the facility would be regulated by "all state and local gambling laws and federal laws apart from IGRA." 73 Fed. Reg. at 6022. Thus the majority's holding that no Indian lands determination by the NIGC must precede the construction of an Indian tribal casino is a disaster waiting to happen. These state and local regulations, and federal regulations apart from IGRA, may be stringent or prohibitive, thus depriving the Indian tribe of their planned economic revenue, and rendering its investment in the gaming facility an economic liability. Such an event would hinder the principal goals of federal Indian policy of promoting self-sufficiency and economic development.

The legislative purposes outlined by Congress in enacting the IGRA also underscore the NIGC's implicit duty to make an Indian lands determination. One of the statute's stated purposes is "to declare that the establishment of independent

Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands . . . are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(3). How could the NIGC, the agency tasked with regulating and protecting gaming on Indian lands effectuate this intent without determining whether proposed gaming was on Indian lands and thus within its jurisdiction? The NIGC, like all federal agencies, does not have authority that expands beyond what Congress has delegated to it. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency . . . has no power to act . . . unless and until Congress confers powers upon it."). The NIGC, therefore, cannot allow construction of a new gaming facility before it determines that it has jurisdiction over that specific site. *Cf. Citizens Against Casino Gambling in Erie County v. Kempthorne* ("*Erie County*"), 471 F. Supp. 2d 295 (W.D.N.Y. 2007) (determining that the NIGC had to make an Indian lands determination prior to approving a non-site-specific ordinance). Stated simply, the NIGC has no statutory authority to empower a regime under which tribes could build casinos at any location, whether or not on Indian lands.

The court in *Erie County* held that the NIGC must satisfy its jurisdiction before it approves a general non-site-specific gaming ordinance. *Id.* I do not think that is necessary for a non-site-specific gaming ordinance. The NIGC must have satisfied its own jurisdiction before it regulates class II or class III gaming under the statute, but the NIGC could choose to do this after it approves a general ordinance and before the Indian tribe issues a site-specific license. The NIGC is best left to determine the appropriate procedural method to carry out its duties. *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978) (emphasizing that the formulation of procedures is left to the sound discretion of the administrative agency). What is important is that

the NIGC make its Indian lands determination before an Indian tribe commences construction on a particular location.[2]

Finally, the majority's interpretation of the statute is inconsistent with the policy and necessary assumptions of several other provisions of the statute. *See Timbers of Inwood Forest Assocs.*, 484 U.S. at 371 (interpreting one section of the Bankruptcy Code to be consistent with the policy of other provisions of the Code); *Gade v. Nat.'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99-102 (1992) (interpreting the Occupational Safety and Health Act to be consistent with the assumptions of other provisions). There can be no question that several provisions of the statute apply exclusively to Indian lands and that these sections presuppose that the NIGC will make an Indian lands determination. The statute defines "Indian lands," 25 U.S.C. § 2703(4); it gives the Commission authority to monitor class II gaming "conducted on Indian lands" and to inspect class II gaming facilities "located on Indian lands," *id.* § 2706(b); it provides for the Chairman to approve tribal ordinances concerning the conduct or regulation of class I and class II gaming "on Indian lands," *id.* § 2710(a); the statute forbids that authorized gaming occur on lands acquired by the Secretary in trust for the Indian tribe after the date of the enactment of the Act, with some specific exceptions, *id.* § 2719; and the statute makes theft from gaming establishments "on Indian lands" a federal crime, 18 U.S.C. § 1167-68. In the face of these provisions, how can the NIGC not have an obligation to determine whether a gaming site is Indian lands? I conclude that it must make such a determination. All of these statutory provisions presuppose that the NIGC will determine whether the gambling site is on Indian lands. With-

---

[2]The NIGC now recognizes that its job must include the ability to make an Indian lands determination after approving a non-site-specific ordinance. The agency has implemented regulations that require an Indian tribe to submit Indian lands information to the NIGC at least 120 days before the tribe issues a new license for a gaming facility, though the regulations do not expressly require NIGC to make an Indian lands determination after getting that information. *See* 25 C.F.R. § 559.2.

out an Indian lands determination, these provisions make no sense and would be unworkable. Therefore, the policy and necessary assumptions of the statute compel the conclusion that the NIGC has a duty to make an Indian lands determination before allowing casino construction to go forward.

Looking at the IGRA as a whole, I conclude that Congress conferred upon the NIGC a duty to make an Indian lands determination before construction of a gaming facility can commence. The NIGC, as the agency tasked with implementing the IGRA, has the appropriate powers to decide the manner in which it implements this duty, but it was a duty nonetheless that had to be implemented before construction began at the challenged site, an obligation that the NIGC has shirked in this case. I respectfully dissent and would hold that the NIGC has acted in an arbitrary and capricious manner by not fulfilling that duty.