**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STATE OF KANSAS, ex rel Derek
Schmidt, Attorney General; CHEROKEE
COUNTY, KANSAS, Board of County
Commissioners,

     Plaintiffs - Appellants,

v.

RYAN ZINKE,[*] Secretary of the United
States Department of Interior, in his official
capacity; NATIONAL INDIAN GAMING
COMMISSION; JONODEV OSCELOA
CHAUDHURI, National Indian Gaming
Commissioner, in his official capacity;
DANIEL J. LITTLE, Associate
Commissioner National Indian Gaming
Commission, in his official capacity;
DEPARTMENT OF INTERIOR; ERIC N.
SHEPARD, General Counsel National
Indian Gaming Commission, in his official
capacity; KEVIN K. WASHBURN,
Assistant Secretary of Indian Affairs for
the United States Department of Interior, in
his official capacity; JOHN BERREY,
Chairperson of the Quapaw Tribe of
Oklahoma Business Committee and
Chairperson of the Downstream
Development; THOMAS MATHEWS,
Vice-Chairperson of Quapaw Tribe of
Oklahoma Business Committee; TAMARA
SMILEY-REEVES, Secretary/Treasurer of
Quapaw Tribe of Oklahoma Business

No. 16-3015

_____

[*] Pursuant to Fed. R. App. P. 43(c)(2) as of March 1, 2017, Sally Jewell is
replaced by Ryan Zinke as the Secretary of the United States Department of Interior.

Committee, Secretary of the Quapaw Tribe of Oklahoma Development Corporation, and member of the Downstream Development Authority; T. C. BEAR, Member of Quapaw Tribe of Oklahoma Business Committee and Quapaw Gaming Authority; BETTY GAEDTKE, Member of Quapaw Tribe of Oklahoma Business Committee; RANNY MCWATTERS, Member of Quapaw Tribe of Oklahoma Business Committee and Treasurer of the Downstream Development Authority; MARILYN ROGERS, Member of Quapaw Tribe of Oklahoma Business Committee, Quapaw Gaming Authority, and Downstream Development Authority; TRENTON STAND, Member of Quapaw Gaming Authority; LORI SHAFER, Member of Quapaw Gaming Authority; JUSTIN PLOTT; FRAN WOOD, Member of Quapaw Gaming Authority; LARRY RAMSEY, Secretary of the Downstream Development Authority; BARBARA KYSER-COLLIER, Executive Director of the Quapaw Gaming Oklahoma Tribal Gaming Agency; ERIN SHELTON, Deputy Director of the Quapaw Tribe of Oklahoma Tribal Gaming Agency, a/k/a Erin Eckart; RODNEY SPRIGGS, President of the Quapaw Development Corporation; ART COUSATTE, Vice-President of the Quapaw Development Corporation; DONNA MERCER, Treasurer of the Quapaw Development Corporation; JERRI MONTGOMERY, Member of the Quapaw Development Corporation; QUAPAW DEVELOPMENT CORPORATION; DOWNSTREAM DEVELOPMENT AUTHORITY OF THE QUAPAW TRIBE OF OKLAHOMA, (O-GAH-PAH); QUAPAW GAMING AUTHORITY,

2

Defendants - Appellees,

------------------------------

IOWA TRIBE OF KANSAS AND
NEBRASKA; SAC AND FOX NATION
OF MISSOURI IN KANSAS AND
NEBRASKA,

Movants.

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:15-CV-04857-DDC-KGS)**

_____

Bryan C. Clark, Assistant Solicitor General (Jeffrey A. Chanay, Chief Deputy Attorney General, and Stephen Phillips, Assistant Attorney General, and David R. Cooper, Fisher, Patterson, Sayler & Smith, LLP, with him on the briefs), Office of the Attorney General, Topeka, Kansas, for Plaintiffs-Appellants.

Ellen J. Durkee (Thomas E. Beall, Acting United States Attorney, District of Kansas, Jackie A. Rapstine, Assistant United States Attorney, John C. Cruden, Assistant Attorney General, Daron T. Carreiro, and Katherine J. Barton, and Jo-Ann Shyloski, Office of the General Counsel, National Indian Gaming Commission, Washington, D.C., and Jennifer Christopher, Office of the Solicitor, Department of the Interior, Washington, D.C., with him on the brief), Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for the Federal Defendants-Appellees.

Stephen R. Ward (Paul M. Croker, Armstrong Teasdale, LLP, Kansas City, Missouri, and Daniel E. Gomez, and R. Daniel Carter, with him on the brief), Conner & Winters, LLP, Tulsa, Oklahoma, for the Quapaw Tribal Defendants-Appellees.

_____

Before **KELLY**, **LUCERO**, and **MURPHY**, Circuit Judges.

_____

**LUCERO**, Circuit Judge.

_____

3

The question in this case is whether a legal opinion letter issued by the Acting General Counsel of the National Indian Gaming Commission ("NIGC") regarding the eligibility of Indian lands for gaming constitutes "final agency action" subject to judicial review. In response to a request from the Quapaw Tribe, the NIGC Acting General Counsel issued a legal opinion letter stating that the Tribe's Kansas trust land was eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"). The State of Kansas and the Board of County Commissioners of the County of Cherokee, Kansas, filed suit, arguing that the letter was arbitrary, capricious, and erroneous as a matter of law. The district court concluded that the letter did not constitute reviewable final agency action under IGRA or the Administrative Procedure Act ("APA").

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. IGRA's text, statutory scheme, legislative history, and attendant regulations demonstrate congressional intent to preclude judicial review of legal opinion letters. Further, the Acting General Counsel's letter does not constitute final agency action under the APA because it has not determined any rights or obligations or produced legal consequences. In short, the letter merely expresses an advisory, non-binding opinion, without any legal effect on the status quo ante.

**I**

The Quapaw Tribe of Indians is a federally recognized tribe. Indian Entities Recognized & Eligible to Receive Services from the U.S. Bureau of Indian Affairs, 81 Fed. Reg. 26,826, 26,830 (May 4, 2016). Pursuant to an 1833 treaty with the

United States, the Tribe was relocated from its homeland in Arkansas to a reservation near what is now the border between Oklahoma and Kansas. See Treaty with the Quapaw art. 2, May 13, 1833, 7 Stat. 424. Although most of the Quapaw Reservation was located in present-day Oklahoma, it extended about one-half mile north of the state border into Kansas, in what is known as the "Quapaw Strip." In 1867, the Tribe ceded the Quapaw Strip to the United States but retained a small set-aside for a tribal member. Treaty with the Seneca, Mixed Seneca and Shawnee, Quapaw, Etc. art. IV, Feb. 23, 1867, 15 Stat. 513. The United States allotted the remainder of the Quapaw Reservation to individual tribal members in 1895. Act of March 2, 1985, ch. 188, 28 Stat. 876, 907.

At issue in this case is a 124-acre parcel in Kansas (the "Kansas land") that is directly adjacent to the Kansas-Oklahoma border and within the historic boundaries of the Quapaw Strip. The Quapaw reacquired this property in 2006 and 2007 and uses it as a parking lot and support area for its Downstream Casino Resort, which is located on Indian trust lands across the border in Oklahoma.

In 2012, the Department of the Interior ("DOI") took the Kansas land into trust for the Tribe. Approximately one year later, the Tribe requested a legal opinion from the NIGC Office of General Counsel addressing whether the property satisfies the "last recognized reservation" exception to IGRA's prohibition against gaming on trust lands acquired after October 17, 1988. This exception applies when "the Indian tribe has no reservation on October 17, 1998," and the "[trust] lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized

5

reservation within the State or States within which such Indian tribe is presently located." 25 U.S.C. § 2719(a)(2)(B).  See also 25 C.F.R. § 292.4(b)(2).  On November 21, 2014, the NIGC Acting General Counsel sent a letter to the Tribe's attorney concluding that the Kansas land is eligible for gaming under IGRA's "last recognized reservation" exception.  The letter further states that "[t]his legal opinion does not constitute final agency action for purposes of review in federal court."

Plaintiffs filed this action against the NIGC in 2015.  They claim that the letter's application of the last recognized reservation exception to the Kansas land was arbitrary, capricious, and erroneous as a matter of law.[1]  The NIGC moved to dismiss on the ground that the letter did not constitute final agency action.  The district court granted the motion, holding that neither IGRA nor the APA authorized judicial review of the letter and thus the court lacked subject matter jurisdiction. Plaintiffs timely appealed.

## II

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999) (quotation omitted).  The APA contains a limited waiver of sovereign immunity, allowing for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  However, this waiver does not apply if a "statute[] preclude[s] judicial

---

[1] Plaintiffs also named various tribal parties as defendants in the suit; however, the district court's dismissal of those claims is not before us on appeal.

review." 5 U.S.C. § 701(a)(1). The district court determined that IGRA precluded review of the letter and that the letter did not meet the two-part test for final agency action under the APA. See generally Bennett v. Spear, 520 U.S. 154, 177-78 (1997). We review these conclusions de novo. Colo. Farm Bureau Fed'n v. U.S. Forest Serv., 220 F.3d 1171, 1173 (10th Cir. 2000).

## A

Although there is a "strong presumption that Congress intends judicial review of administrative action," Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986), superseded on other grounds by 42 U.S.C. § 405, that presumption "may be overcome by . . . a specific congressional intent to preclude judicial review that is fairly discernible in the detail of the legislative scheme," id. at 673 (quotations omitted). In discerning congressional intent, we look to the express language of a statute and to "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administration action involved." Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984). After examining these features of IGRA, we conclude it is "fairly discernible" that Congress did not intend for the Acting General Counsel's letter to be reviewable final agency action.

IGRA expressly identifies four categories of NIGC decisions that constitute reviewable "final agency actions" under the APA. See 25 U.S.C. § 2714. Under § 2714, courts may review "[d]ecisions made by the Commission pursuant to sections 2710 [tribal gaming ordinances], 2711 [management contracts], 2712 [existing ordinances and contracts], and 2713 [civil penalties or closures for gaming conducted

7

in violation of IGRA, implementing regulations, or an approved tribal gaming ordinance]."

Nothing in this section provides that NIGC General Counsel letters are final agency actions. And, as at least one court has noted, because "Congress specifically stat[ed] in § 2714 that the [enumerated] sections represent final agency actions, the implied corollary is that other agency actions are not final, and ergo, not reviewable." Cheyenne-Arapahoe Gaming Comm'n v. Nat'l Gaming Comm'n, 214 F. Supp. 2d 1155, 1171 (N.D. Okla. 2002). This reading accords with our prior decisions holding that similar agency legal opinions do not constitute reviewable final action. See Oklahoma v. Hobia, 775 F.3d 1204 (10th Cir. 2014); Miami Tribe of Okla. v. United States, 198 F. App'x 686, 690 (10th Cir. 2006) (unpublished) (citing § 2714 and holding that a DOI opinion letter did not constitute reviewable final agency action because it was "only a part of the process that [would] eventually result in [a] final NIGC action"). In Hobia, we concluded that a letter from the NIGC Chairwoman, which adopted an opinion of the General Counsel that certain lands were ineligible for gaming under IGRA, was not final agency action and thus did not moot Oklahoma's suit to prevent the construction of a gaming facility on those lands. 775 F.3d at 1210. In reaching that holding, we determined that the letter fell outside the scope of § 2714, which "defin[es] what constitutes final agency action under IGRA." Id.[2]

_____

[2] Plaintiffs contend that this determination was merely dicta and not essential to our ultimate resolution of the mootness issue. We disagree. Although the issue

8

We acknowledge that § 2714's omission of opinion letters is not by itself conclusive. See Hamilton Stores, Inc. v. Hodel, 925 F.2d 1272, 1277 (10th Cir. 1991) ("[T]he mere fact that some acts are made reviewable by the express language of the relevant statute or statutes should not suffice to support an implication of exclusion as to others." (brackets omitted) (quoting Bowen, 476 U.S. at 674)). However, the types of actions listed in § 2714 and IGRA's broader statutory scheme indicate that Congress did not intend for NIGC General Counsel letters to be final action subject to judicial review. In contrast to the letter at issue in this case, each of the "final agency actions" in § 2714 requires a decision by the full Commission after an attendant administrative process. 25 C.F.R. pts. 522, 533, 573, 575, 580-585. The actions in § 2714 further correspond to the Commission's decisionmaking authority under IGRA. Sections 2710 to 13 confer authority on the NIGC to take specific actions to regulate gaming on Indian lands (e.g., approval or disapproval of ordinances and management contracts, and enforcement action). By comparison, § 2719 merely identifies which lands will be eligible for gaming. It does not discuss the Commission, let alone authorize the agency to take actions to enforce the

---

might have benefited from further analysis, our discussion of § 2714 provided the key rationale for our conclusion that the case was not moot. Moreover, the fact that the letter in Hobia "anticipated the possibility of future wrongful conduct on the part of the Tribe" does not alone distinguish it from the letter at issue in this case. Id. at 1211. Although the Acting General Counsel's letter does not expressly threaten the Tribe with future enforcement action (nor would it make sense to do so, given the letter's conclusion that the Kansas land is eligible for gaming), it states that the opinion "does not constitute final agency action for purposes of review in federal district court." Accordingly, the Tribe was on notice that the NIGC itself viewed the letter as non-binding, which left open the possibility of future enforcement action.

9

provision. Id. Instead, the NIGC enforces § 2719 through actions taken pursuant to §§ 2710-13. Likewise, although IGRA provides for the position of General Counsel, 25 U.S.C. § 2707(a), it does not grant the General Counsel any authority to bind the agency, nor does it specifically empower the General Counsel to make decisions as to the eligibility of land for gaming. Compare § 2707(a), with 25 U.S.C. § 2706 (granting specific powers to the Commission), and 25 U.S.C. § 2705(b) (granting to the Chairman "such other powers as may be delegated by the Commission"). Finally, neither IGRA nor its implementing regulations require the Office of General Counsel to issue legal opinions on any topic; rather, these opinions are "a courtesy." See Legal Opinions, Nat'l Indian Gaming Comm'n, https://www.nigc.gov/general-counsel/legal-opinions (last visited May 31, 2017).

IGRA's legislative history reinforces our conclusion that the Acting General Counsel's letter is not reviewable final agency action under IGRA. Although a report from the Senate Select Committee on Indian Affairs initially states that "[a]ll decisions of the Commission are final agency decisions," it later clarifies in the more detailed "Section By Section Analysis," that only "certain Commission decisions will be final agency decisions for purposes of court review." S. Rep. No. 100-446, at 8, 20 (1988), as reprinted in 1988 U.S.C.C.A.N. 3071, 3078, 3090 (emphasis added). To the extent that the report gives conflicting signals about which agency actions constitute final decisions, it consistently suggests that only "decisions of the Commission" are subject to judicial review. See id. at 8, 20. An opinion letter from an NIGC employee such as the Acting General Counsel plainly does not qualify.

10

Plaintiffs argue that DOI regulations promulgated in 2008 assume that agency decisions under § 2719 are reviewable final agency actions. They point to 25 C.F.R. § 292.26(a), which states that the 2008 regulations "do not alter final agency decisions made pursuant to 25 U.S.C. § 2719 before the date of enactment of these regulations." But when considered in context, this provision does not support plaintiffs' position. As the preamble to the regulations explains, during the formulation of the rules, the DOI and the NIGC issued

> a number of legal opinions to address the ambiguities left by Congress and provide legal advice for agency decisionmakers, or in some cases, for the interested parties facing an unresolved legal issue. . . . In some cases, the [DOI] or the NIGC subsequently relied on the legal opinion to take some final agency action. In those cases, section 292.26(a) makes clear that these regulations will have no retroactive effect to alter any final agency decisions made prior to the effective date of these regulations.

Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,372 (May 20, 2008).

In other words, § 292.26(a) was intended to clarify that the 2008 regulations would not apply to final agency action taken prior to the effective date of the regulations or pursuant to an earlier legal opinion issued by the DOI or the NIGC. It does not suggest that legal opinions are final agency actions. This distinction between advisory legal opinions and final agency action is further highlighted in § 292.26(b), which provides that the "regulations shall not apply to applicable agency actions when, before the effective date of [the] regulations, the [DOI] or the [NIGC] issued a written opinion regarding the applicability of 25 U.S.C. § 2719." The

11

preamble thus clarifies that this provision's purpose is to allow the federal government to "follow through with its prior legal opinions and take final agency actions consistent with those opinions, even if [the 2008 DOI regulations] have created a conflict." 73 Fed. Reg. at 29,372. At the same time, the regulation retains the DOI's and the NIGC's right to "qualify, modify, or withdraw its prior legal opinions." Id. These statements all demonstrate that legal opinions are not final agency actions; rather, the NIGC may use them to make final decisions in the future. To this point, the preamble emphasizes that § 292.26 and the other 2008 regulations "do not alter the fact that the legal opinions are advisory in nature and thus do not legally bind the persons vested with the authority to make final agency decisions." Id.

In sum, IGRA's text, statutory structure, legislative history, and associated regulations all establish that Congress did not intend judicial review of NIGC General Counsel opinion letters.

**B**

Even assuming that IGRA does not demonstrate a clear congressional intent to preclude judicial review of the Acting General Counsel's letter, the letter does not qualify as final agency action under the APA. An agency action is final if: (1) it "mark[s] the consummation of the agency's decisionmaking process"—i.e., "it [is] not . . . of a merely tentative or interlocutory nature"; and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." Bennett, 520 U.S. at 177-78 (quotations omitted). Because we conclude

12

that the letter fails the second requirement, we need not address whether the letter satisfies the first.

Plaintiffs contend that the letter determined the parties' rights and obligations and resulted in legal consequences by: (1) enabling the Tribe to expand gaming to the Kansas land; (2) obligating the State to negotiate a class III tribal-state gaming compact with the Tribe; and (3) prompting the Tribe to sue the State in order to compel it to negotiate a gaming compact. But these arguments fundamentally misapprehend IGRA. As a general matter, the Acting General Counsel's letter does not grant the Tribe a right to engage in gaming; IGRA itself does not even confer such a right. Rather, tribes' right to game on Indian lands derives from their sovereign authority to regulate themselves and their members within Indian country, without state interference. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207, 214-15 (1987) (recognizing that states generally may not regulate tribes on reservations absent congressional authorization), superseded by statute on other grounds as stated in Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024, 2034 (2014). IGRA expressly recognizes tribes' sovereign right to exclusively regulate gaming activity on their lands, subject to the statute's limitations. See 25 U.S.C. § 2701(5).[3]

---

[3] Plaintiffs argue that because the NIGC only has jurisdiction over gaming on Indian lands, the Acting General Counsel's determination triggers the NIGC's monitoring and enforcement responsibilities at the expense of the State's authority over gaming on non-Indian lands. They contend that this is a "legal consequence" sufficient to satisfy Bennett's second prong. But plaintiffs' argument confuses an Indian lands determination with a conclusion that the Kansas land is eligible for

13

Further, the Tribe's ability to begin gaming on the Kansas land is not a legal consequence of the Acting General Counsel's letter. Because the Tribe already has a non-site-specific gaming ordinance, it may start class II gaming on the property irrespective of the letter. See § 2710(b). Although requesting legal guidance from the NIGC Office of General Counsel may be a prudent investment practice for tribes concerned about the possibility of civil penalties under § 2713, nothing in IGRA requires the NIGC to issue an opinion letter, let alone make an Indian lands eligibility determination before a tribe conducts class II gaming. See N. Cty. Cmty. Alliance, Inc. v. Salazar, 573 F.3d 738, 747 (9th Cir. 2009); Legal Opinions, Nat'l Indian Gaming Comm'n, https://www.nigc.gov/general-counsel/legal-opinions (last visited May 31, 2017). Even if the NIGC were to later bring an enforcement action against the Quapaw for gaming on ineligible lands, the Tribe could not use the non-binding letter as a defense. As noted above, the NIGC General Counsel lacks authority to bind the agency under IGRA. Nor will the letter inevitably lead to class III gaming on the Kansas land. The Tribe has yet to satisfy the two preconditions necessary for such gaming to occur: a gaming compact with the State, and approval of that compact by the Secretary of the Interior. See § 2710(d)(3)(A).

---

gaming under IGRA's last recognized reservation exception. There is no question that the Kansas land constitutes "Indian land" because the land was taken into trust for the Quapaw Tribe in 2012. See 25 U.S.C. § 2703 (defining "Indian lands" as "all lands within the limits of any Indian reservation" and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual"). The issue relevant to this case is whether the land qualifies for an exception to IGRA's general prohibition against gaming on trust lands acquired after the Act's effective date.

14

Plaintiffs' second argument—that the opinion letter required the State to negotiate a class III gaming compact with the Tribe—also fails. IGRA itself imposes an obligation on the State to negotiate a gaming compact in good faith at the Tribe's request. Id. The only condition under the statute triggering this obligation is a tribe's request to enter into such negotiations. See Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1028 (2d Cir. 1990). IGRA does not require the NIGC to also make a preliminary determination that the lands are eligible for gaming. See id. at 1028-29 (rejecting argument that the state's obligation to negotiate a compact had not arisen because the tribe had yet to adopt an ordinance authorizing gaming on the reservation).[4] Thus, because the Tribe submitted a compact proposal to the State in 2013, Kansas was required to enter into compact negotiations in good faith, regardless of the Acting General Counsel's letter. The letter therefore did not determine the parties' rights and obligations with respect to class III gaming.

--------

[4] This conclusion is not altered by our statement in Kansas v. United States, 249 F.3d 1213 (10th Cir. 2001), that a favorable Indian lands determination by the NIGC under § 2710 "impos[ed] a legal duty on the State under IGRA to negotiate a Class III gaming compact at the Tribe's request." Id. at 1224. In contrast to this case, which involves application of IGRA's last recognized reservation exception, the NIGC determination at issue in Kansas affected whether the lands at issue were subject to IGRA at all. See id. at 1223 (noting that "if the tract [did] not qualify as 'Indian lands,' then IGRA does not apply"). A determination that the lands were not "Indian lands" within the meaning of the statute would have absolved the state of any obligations under IGRA, including the obligation to negotiate a tribal-state gaming compact at the tribe's request. Id. That is not the situation here: it is undisputed that the Kansas land constitutes "Indian land," and thus the State must abide by IGRA's requirements.

15

For similar reasons, we reject plaintiffs' argument that the Tribe's lawsuit to compel the State to negotiate a class III gaming compact represents a legal consequence of the Acting General Counsel's letter.[5] Although the letter may have influenced the Tribe's decision to bring suit, it did not legally prompt the litigation. Rather, the State's purported failure to enter into compact negotiations in good faith gave rise to the Tribe's cause of action under IGRA. See 2710(d)(7)(A)(i) (providing for federal court jurisdiction "over any cause of action initiated by an Indian tribe arising from the failure of a State to enter into [Tribal-State compact] negotiations . . . or to conduct such negotiations in good faith").

Plaintiffs' attempt to compare this case to U.S. Army Corps of Engineers v. Hawkes Co., Inc., 136 S. Ct. 1807 (2016), is unavailing. In Hawkes, the Supreme Court concluded that an approved jurisdictional determination ("JD") by the U.S. Army Corps of Engineers, which states that a particular property contains "waters of the United States" under the Clean Water Act, is a reviewable final agency action. 136 S. Ct. at 1813-15. In determining that the approved JD satisfied the second Bennett prong, the Court reasoned that negative JDs—i.e., determinations that property does not contain "waters of the United States"—"limit[] the potential

_____

[5] Relatedly, plaintiffs allege that the Tribe's lawsuit is a first step in its efforts to have the Secretary of the Interior issue class III gaming procedures under 25 C.F.R. pt. 291. This claim is meritless for two reasons. First, tribes can ask the Secretary to issue these procedures without an opinion letter from Acting General Counsel. See 25 C.F.R. § 291.3 (listing requirements for a tribe to request that the Secretary issue class III gaming procedures). Second, we recently struck down pt. 291 as an invalid exercise of the Secretary's authority in New Mexico v. Department of the Interior, No. 14-2219, 2017 WL 1422365, at *17 (10th Cir. Apr. 21, 2017).

16

liability a landowner faces for discharging pollutants without a permit." Id. at 1814.

Thus, it "follow[ed] that affirmative JDs have legal consequences as well: They

represent the denial of the safe harbor that negative JDs afford." Id. Plaintiffs

contend that because a "negative" gaming eligibility opinion (one stating that certain

land is ineligible for gaming) would have put the Tribe on notice of the possibility of

a future enforcement action, it constitutes reviewable final agency action under

Hawkes. The logical corollary, plaintiffs reason, is that an "affirmative" gaming

eligibility opinion, such as the Acting General Counsel's letter, is similarly

reviewable. But this argument ignores the fact that the Court's holding in Hawkes

turned on the JD's ability to bind the agency for five years. See id. at 1814-15. That

critical circumstance is absent from this case because the Acting General Counsel's

letter is advisory and non-binding.

Plaintiffs' reference to Frozen Food Express v. United States, 351 U.S. 40

(1956), is equally unpersuasive. There, the Court concluded that an order listing

which commodities the Interstate Commerce Commission ("ICC") believed to be

exempt from certain permitting requirements under the Interstate Commerce Act

constituted a final agency action. Id. at 42. In so holding, the Court reasoned that

the order had an immediate and practical impact on regulated parties by "warn[ing]

every carrier, who d[id] not have authority from the Commission to transport those

commodities, that it d[id] so at the risk of incurring criminal penalties." Id. at 44.

However, the difference between this case and Frozen Food Express is that there,

"the order itself was the source of the [parties'] obligation[s], modifying the

17

applicable legal landscape by interpreting the scope of the agricultural commodities exception." Golden & Zimmerman, LLC v. Domenech, 599 F.3d 426, 433 (4th Cir. 2010). In contrast, the Acting General Counsel's opinion letter does not "modify the legal landscape" or create any obligations from which legal consequences may flow. Not only was the letter furnished by an employee of the agency rather than the full Commission, but also the letter makes clear that the NIGC is free to reach a different conclusion as to the Kansas land's eligibility for gaming at any time.[6] These facts further distinguish this case from Frozen Food Express, where the order was issued by the ICC, and "[t]he Commission itself . . . argue[d] for finality." See Frozen Food Express, 351 U.S. at 44-45.

### III

Because the Acting General Counsel's opinion letter does not constitute final agency action under either IGRA or the APA, we **AFFIRM** the district court's dismissal of this case for lack of subject matter jurisdiction. We also **GRANT** federal appellees' motion to take judicial notice of the pleadings and court order filed in Quapaw Tribe of Indians v. Kansas, No. 16-cv-2037-JWL-TJJ (D. Kan. Mar. 3, 2016).

---

[6] The NIGC could make a determination about the Kansas land's eligibility for gaming if: (1) the Tribe seeks NIGC approval of a site-specific gaming ordinance for the Kansas land under § 2710; (2) the Tribe seeks approval of a management contract under § 2711; or (3) the Tribe opens a gaming facility on the Kansas land, in which case the NIGC could determine that the land is ineligible for gaming and impose fines or temporary closure orders under § 2713.

18