(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES ARMY CORPS OF ENGINEERS *v.* HAWKES CO., INC., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 15–290. Argued March 30, 2016—Decided May 31, 2016

The Clean Water Act regulates "the discharge of any pollutant" into "the waters of the United States." 33 U. S. C. §§1311(a), 1362(7), (12). When property contains such waters, landowners who discharge pollutants without a permit from the Army Corps of Engineers risk substantial criminal and civil penalties, §§1319(c), (d), while those who do apply for a permit face a process that is often arduous, expensive, and long. It can be difficult to determine in the first place, however, whether "waters of the United States" are present. During the time period relevant to this case, for example, the Corps defined that term to include all wetlands, the "use, degradation or destruction of which could affect interstate or foreign commerce." 33 CFR §328.3(a)(3). Because of that difficulty, the Corps allows property owners to obtain a standalone "jurisdictional determination" (JD) specifying whether a particular property contains "waters of the United States." §331.2. A JD may be either "preliminary," advising a property owner that such waters "may" be present, or "approved," definitively "stating the presence or absence" of such waters. *Ibid.* An "approved" JD is considered an administratively appealable "final agency action," §§320.1(a)(6), 331.2, and is binding for five years on both the Corps and the Environmental Protection Agency, 33 CFR pt. 331, App. C; EPA, Memorandum of Agreement: Exemptions Under Section 404(F) of the Clean Water Act §VI–A.

Respondents, three companies engaged in mining peat, sought a permit from the Corps to discharge material onto wetlands located on property that respondents own and hope to mine. In connection with the permitting process, respondents obtained an approved JD from the Corps stating that the property contained "waters of the United

Syllabus

States" because its wetlands had a "significant nexus" to the Red River of the North, located some 120 miles away. After exhausting administrative remedies, respondents sought review of the approved JD in Federal District Court under the Administrative Procedure Act (APA), but the District Court dismissed for want of jurisdiction, holding that the revised JD was not a "final agency action for which there is no other adequate remedy in a court," 5 U. S. C. §704. The Eighth Circuit reversed.

*Held*: The Corps' approved JD is a final agency action judicially reviewable under the APA. Pp. 5–10.

    (a) In general, two conditions must be satisfied for an agency action to be "final" under the APA: "First, the action must mark the consummation of the agency's decisionmaking process," and "second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett* v. *Spear*, 520 U. S. 154, 177–178. Pp. 5–8.

      (1) An approved JD satisfies *Bennett*'s first condition. It clearly "mark[s] the consummation" of the Corps' decisionmaking on the question whether a particular property does or does not contain "waters of the United States." It is issued after extensive factfinding by the Corps regarding the physical and hydrological characteristics of the property, see U. S. Army Corps of Engineers, Jurisdictional Determination Form Instructional Guidebook 47–60, and typically remains valid for a period of five years, see 33 CFR pt. 331, App. C. The Corps itself describes approved JDs as "final agency action." *Id.* §320.1(a)(6). Pp. 5–6.

      (2) The definitive nature of approved JDs also gives rise to "direct and appreciable legal consequences," thereby satisfying *Bennett*'s second condition as well. 520 U. S., at 178. A "negative" JD—*i.e.*, an approved JD stating that property does not contain jurisdictional waters—creates a five-year safe harbor from civil enforcement proceedings brought by the Government and limits the potential liability a property owner faces for violating the Clean Water Act. See 33 U. S. C. §§1319, 1365(a). Each of those effects is a legal consequence. It follows that an "affirmative" JD, like the one issued here, also has legal consequences: It deprives property owners of the five-year safe harbor that "negative" JDs afford. This conclusion tracks the "pragmatic" approach the Court has long taken to finality. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 149. Pp. 6–8.

    (b) A "final" agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court. The Corps contends that respondents have two such alternatives: They may proceed without a permit and argue in a Government enforcement action that a permit was not required, or they may complete the

Syllabus

permit process and then seek judicial review, which, the Corps suggests, is what Congress envisioned. Neither alternative is adequate. Parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of "serious criminal and civil penalties." *Abbott*, 387 U. S., at 153. And the permitting process is not only costly and lengthy, but also irrelevant to the finality of the approved JD and its suitability for judicial review. Furthermore, because the Clean Water Act makes no reference to standalone jurisdictional determinations, there is little basis for inferring anything from it concerning their reviewability. Given "the APA's presumption of reviewability for all final agency action," *Sackett* v. *EPA*, 566 U. S. ___, ___, "[t]he mere fact" that permitting decisions are reviewable is insufficient to imply "exclusion as to other[ ]" agency actions, such as approved JDs, *Abbott*, 387 U. S., at 141. Pp. 8–10.

782 F. 3d 994, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, THOMAS, BREYER, ALITO, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY, J., filed a concurring opinion, in which THOMAS and ALITO, JJ., joined. KAGAN, J., filed a concurring opinion. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–290

UNITED STATES ARMY CORPS OF ENGINEERS, PETITIONER *v.* HAWKES CO., INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[May 31, 2016]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Clean Water Act regulates the discharge of pollutants into "the waters of the United States." 33 U. S. C. §§1311(a), 1362(7), (12). Because it can be difficult to determine whether a particular parcel of property contains such waters, the U. S. Army Corps of Engineers will issue to property owners an "approved jurisdictional determination" stating the agency's definitive view on that matter. See 33 CFR §331.2 and pt. 331, App. C (2015). The question presented is whether that determination is final agency action judicially reviewable under the Administrative Procedure Act, 5 U. S. C. §704.

## I

### A

The Clean Water Act prohibits "the discharge of any pollutant" without a permit into "navigable waters," which it defines, in turn, as "the waters of the United States." 33 U. S. C. §§1311(a), 1362(7), (12). During the time period relevant to this case, the U. S. Army Corps of Engineers defined the waters of the United States to include land

areas occasionally or regularly saturated with water—such as "mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, [and] playa lakes"—the "use, degradation or destruction of which could affect interstate or foreign commerce." 33 CFR §328.3(a)(3) (2012). The Corps has applied that definition to assert jurisdiction over "270-to-300 million acres of swampy lands in the United States—including half of Alaska and an area the size of California in the lower 48 States." *Rapanos* v. *United States*, 547 U. S. 715, 722 (2006) (plurality opinion).[1]

It is often difficult to determine whether a particular piece of property contains waters of the United States, but there are important consequences if it does. The Clean Water Act imposes substantial criminal and civil penalties for discharging any pollutant into waters covered by the Act without a permit from the Corps. See 33 U. S. C. §§1311(a), 1319(c), (d), 1344(a). The costs of obtaining such a permit are significant. For a specialized "individual" permit of the sort at issue in this case, for example, one study found that the average applicant "spends 788 days and $271,596 in completing the process," without "counting costs of mitigation or design changes." *Rapanos*, 547 U. S., at 721. Even more readily available "general" permits took applicants, on average, 313 days and $28,915 to complete. *Ibid.* See generally 33 CFR §323.2(h) (limiting "general" permits to activities that "cause only minimal individual and cumulative environmental impacts").

The Corps specifies whether particular property con-

_____

[1] In 2015, the Corps adopted a new rule modifying the definition of the scope of waters covered by the Clean Water Act in light of scientific research and decisions of this Court interpreting the Act. See Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37054, 37055–37056. That rule is currently stayed nationwide, pending resolution of claims that the rule is arbitrary, capricious, and contrary to law. See *In re EPA*, 803 F. 3d 804, 807–809 (CA6 2015).

tains "waters of the United States" by issuing "jurisdictional determinations" (JDs) on a case-by-case basis. §331.2. JDs come in two varieties: "preliminary" and "approved." *Ibid.* While preliminary JDs merely advise a property owner "that there *may* be waters of the United States on a parcel," approved JDs definitively "stat[e] the presence or absence" of such waters. *Ibid.* (emphasis added). Unlike preliminary JDs, approved JDs can be administratively appealed and are defined by regulation to "constitute a Corps final agency action." §§320.1(a)(6), 331.2. They are binding for five years on both the Corps and the Environmental Protection Agency, which share authority to enforce the Clean Water Act. See 33 U. S. C. §§1319, 1344(s); 33 CFR pt. 331, App. C; EPA, Memorandum of Agreement: Exemptions Under Section 404(F) of the Clean Water Act §VI–A (1989) (Memorandum of Agreement).

B

Respondents are three companies engaged in mining peat in Marshall County, Minnesota. Peat is an organic material that forms in waterlogged grounds, such as wetlands and bogs. See Xuehui & Jinming, Peat and Peatlands, in 2 Coal, Oil Shale, Natural Bitumen, Heavy Oil and Peat 267–272 (G. Jinsheng ed. 2009) (Peat and Peatlands). It is widely used for soil improvement and burned as fuel. *Id.,* at 277. It can also be used to provide structural support and moisture for smooth, stable greens that leave golfers with no one to blame but themselves for errant putts. See Monteith & Welton, Use of Peat and Other Organic Materials on Golf Courses, 13 Bulletin of the United States Golf Association Green Section 90, 95–100 (1933). At the same time, peat mining can have significant environmental and ecological impacts, see Peat and Peatlands 280–281, and therefore is regulated by both federal and state environmental protection agencies, see,

*e.g.*, Minn. Stat. §103G.231 (2014).

Respondents own a 530-acre tract near their existing mining operations. The tract includes wetlands, which respondents believe contain sufficient high quality peat, suitable for use in golf greens, to extend their mining operations for 10 to 15 years. App. 8, 14–15, 31.

In December 2010, respondents applied to the Corps for a Section 404 permit for the property. *Id.*, at 15. A Section 404 permit authorizes "the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U. S. C. §1344(a). Over the course of several communications with respondents, Corps officials signaled that the permitting process would be very expensive and take years to complete. The Corps also advised respondents that, if they wished to pursue their application, they would have to submit numerous assessments of various features of the property, which respondents estimate would cost more than $100,000. App. 16–17, 31–35.

In February 2012, in connection with the permitting process, the Corps issued an approved JD stating that the property contained "water of the United States" because its wetlands had a "significant nexus" to the Red River of the North, located some 120 miles away. *Id.*, at 13, 18, 20. Respondents appealed the JD to the Corps' Mississippi Valley Division Commander, who remanded for further factfinding. On remand, the Corps reaffirmed its original conclusion and issued a revised JD to that effect. *Id.,* at 18–20; App. to Pet. for Cert. 44a–45a.

Respondents then sought judicial review of the revised JD under the Administrative Procedure Act (APA), 5 U. S. C. §500 *et seq.* The District Court dismissed for want of subject matter jurisdiction, holding that the revised JD was not "final agency action for which there is no other adequate remedy in a court," as required by the APA prior to judicial review, 5 U. S. C. §704. 963 F. Supp. 2d 868, 872, 878 (Minn. 2013). The Court of Appeals for the

Eighth Circuit reversed, 782 F. 3d 994, 1002 (2015), and we granted certiorari, 577 U. S. \_\_\_ (2015).

## II

The Corps contends that the revised JD is not "final agency action" and that, even if it were, there are adequate alternatives for challenging it in court. We disagree at both turns.

## A

In *Bennett* v. *Spear*, 520 U. S. 154 (1997), we distilled from our precedents two conditions that generally must be satisfied for agency action to be "final" under the APA. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.,* at 177–178 (internal quotation marks and citation omitted).[2]

The Corps does not dispute that an approved JD satisfies the first *Bennett* condition. Unlike preliminary JDs—which are "advisory in nature" and simply indicate that "there may be waters of the United States" on a parcel of property, 33 CFR §331.2—an approved JD clearly "mark[s] the consummation" of the Corps' decisionmaking process on that question, *Bennett*, 520 U. S., at 178 (internal quotation marks omitted). It is issued after extensive factfinding by the Corps regarding the physical and hydrological characteristics of the property, see U. S. Army Corps of Engineers, Jurisdictional Determination Form Instructional Guidebook 47–60 (2007), and is typically not

———————

[2] Because we determine that a JD satisfies both prongs of *Bennett*, we need not consider respondents' argument that an agency action that satisfies only the first may also constitute final agency action. See Brief for Respondents 19–20.

revisited if the permitting process moves forward. Indeed, the Corps itself describes approved JDs as "final agency action," see 33 CFR §320.1(a)(6), and specifies that an approved JD "will remain valid for a period of five years," Corps, Regulatory Guidance Letter No. 05–02, §1(a), p. 1 (June 14, 2005) (2005 Guidance Letter); see also 33 CFR pt. 331, App. C.

The Corps may revise an approved JD within the five-year period based on "new information." 2005 Guidance Letter §1(a), at 1. That possibility, however, is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal. See *Sackett* v. *EPA*, 566 U. S. ___, ___ (2012); see also *National Cable & Telecommunications Assn.* v. *Brand X Internet Services*, 545 U. S. 967, 981 (2005). By issuing respondents an approved JD, the Corps for all practical purposes "has ruled definitively" that respondents' property contains jurisdictional waters. *Sackett*, 566 U. S., at ___ (GINSBURG, J., concurring) (slip op., at 1).

The definitive nature of approved JDs also gives rise to "direct and appreciable legal consequences," thereby satisfying the second prong of *Bennett*. 520 U. S., at 178. Consider the effect of an approved JD stating that a party's property does *not* contain jurisdictional waters—a "negative" JD, in Corps parlance. As noted, such a JD will generally bind the Corps for five years. See 33 CFR pt. 331, App. C; 2005 Guidance Letter §1. Under a longstanding memorandum of agreement between the Corps and EPA, it will also be "binding on the Government and represent the Government's position in any subsequent Federal action or litigation concerning that final determination." Memorandum of Agreement §§IV–C–2, VI–A. A negative JD thus binds the two agencies authorized to bring civil enforcement proceedings under the Clean Water Act, see 33 U. S. C. §1319, creating a five-year safe harbor from such proceedings for a property owner. Addi-

tionally, although the property owner may still face a citizen suit under the Act, such a suit—unlike actions brought by the Government—cannot impose civil liability for wholly past violations. See §§1319(d), 1365(a); *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 58–59 (1987). In other words, a negative JD both narrows the field of potential plaintiffs and limits the potential liability a landowner faces for discharging pollutants without a permit. Each of those effects is a "legal consequence[ ]" satisfying the second *Bennett* prong. 520 U. S., at 178; see also *Sackett*, 566 U. S., at \_\_\_.

It follows that affirmative JDs have legal consequences as well: They represent the denial of the safe harbor that negative JDs afford. See 5 U. S. C. §551(13) (defining "agency action" to include an agency "rule, order, license, sanction, relief, or the equivalent," or the "denial thereof"). Because "legal consequences . . . flow" from approved JDs, they constitute final agency action. *Bennett*, 520 U. S., at 178 (internal quotation marks omitted).[3]

This conclusion tracks the "pragmatic" approach we have long taken to finality. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 149 (1967). For example, in *Frozen Food Express* v. *United States*, 351 U. S. 40 (1956), we considered the finality of an order specifying which commodities the Interstate Commerce Commission believed were exempt by statute from regulation, and which it

———————

[3] The Corps asserts that the Memorandum of Agreement addresses only "special case" JDs, rather than "mine-run" ones "of the sort at issue here." Reply Brief 12, n. 3. But the memorandum plainly makes binding "[a]ll final determinations," whether in "[s]pecial" or "[n]on-special" cases. Memorandum of Agreement §§IV–C, VI–A; see also Corps, Memorandum of Understanding Geographical Jurisdiction of the Section 404 Program, 45 Fed. Reg. 45019, n. 1 (1980) ("[U]nder this [memorandum], except in special cases previously agreed to, the [Corps] is authorized to make a final determination . . . and such determination shall be binding.").

believed were not.  Although the order "had no authority except to give notice of how the Commission interpreted" the relevant statute, and "would have effect only if and when a particular action was brought against a particular carrier," *Abbott*, 387 U. S., at 150, we held that the order was nonetheless immediately reviewable, *Frozen Food*, 351 U. S., at 44–45.  The order, we explained, "warns every carrier, who does not have authority from the Commission to transport those commodities, that it does so at the risk of incurring criminal penalties." *Id.*, at 44.  So too here, while no administrative or criminal proceeding can be brought for failure to conform to the approved JD itself, that final agency determination not only deprives respondents of a five-year safe harbor from liability under the Act, but warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties.

B

Even if final, an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court.  5 U. S. C. §704.  The Corps contends that respondents have two such alternatives: either discharge fill material without a permit, risking an EPA enforcement action during which they can argue that no permit was required, or apply for a permit and seek judicial review if dissatisfied with the results.  Brief for Petitioner 45–51.

Neither alternative is adequate.  As we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of "serious criminal and civil penalties." *Abbott*, 387 U. S., at 153.  If respondents discharged fill material without a permit, in the mistaken belief that their property did not contain jurisdictional waters, they

would expose themselves to civil penalties of up to $37,500 for each day they violated the Act, to say nothing of potential criminal liability. See 33 U. S. C. §§1319(c), (d); *Sackett*, 566 U. S., at ___, n. 1 (citing 74 Fed. Reg. 626, 627 (2009)). Respondents need not assume such risks while waiting for EPA to "drop the hammer" in order to have their day in court. *Sackett*, 566 U. S., at ___ (slip op., at 6).

Nor is it an adequate alternative to APA review for a landowner to apply for a permit and then seek judicial review in the event of an unfavorable decision. As Corps officials indicated in their discussions with respondents, the permitting process can be arduous, expensive, and long. See *Rapanos*, 547 U. S., at 721 (plurality opinion). On top of the standard permit application that respondents were required to submit, see 33 CFR §325.1(d) (detailing contents of permit application), the Corps demanded that they undertake, among other things, a "hydrogeologic assessment of the rich fen system including the mineral/nutrient composition and pH of the groundwater; groundwater flow spatially and vertically; discharge and recharge areas"; a "functional/resource assessment of the site including a vegetation survey and identification of native fen plan communities across the site"; an "inventory of similar wetlands in the general area (watershed), including some analysis of their quality"; and an "inventory of rich fen plant communities that are within sites of High and Outstanding Biodiversity Significance in the area." App. 33–34. Respondents estimate that undertaking these analyses alone would cost more than $100,000. *Id.,* at 17. And whatever pertinence all this might have to the issuance of a permit, none of it will alter the finality of the approved JD, or affect its suitability for judicial review. The permitting process adds nothing to the JD.

The Corps nevertheless argues that Congress made the "evident[ ]" decision in the Clean Water Act that a coverage determination would be made "as part of the permit-

ting process, and that the property owner would obtain any necessary judicial review of that determination at the conclusion of that process." Brief for Petitioner 46. But as the Corps acknowledges, the Clean Water Act makes no reference to standalone jurisdictional determinations, *ibid.*, so there is little basis for inferring anything from it concerning the reviewability of such distinct final agency action. And given "the APA's presumption of reviewability for all final agency action," *Sackett*, 566 U. S., at ___ (slip op., at 8), "[t]he mere fact" that permitting decisions are "reviewable should not suffice to support an implication of exclusion as to other[ ]" agency actions, such as approved JDs, *Abbott*, 387 U. S., at 141 (internal quotation marks omitted); see also *Sackett*, 566 U. S., at ___ (slip op., at 8) ("[I]f the express provision of judicial review in one section of a long and complicated statute were alone enough to overcome the APA's presumption of reviewability . . . , it would not be much of a presumption at all").

Finally, the Corps emphasizes that seeking review in an enforcement action or at the end of the permitting process would be the only available avenues for obtaining review "[i]f the Corps had never adopted its practice of issuing standalone jurisdictional determinations upon request." Reply Brief 3; see also *id.,* at 4, 23. True enough. But such a "count your blessings" argument is not an adequate rejoinder to the assertion of a right to judicial review under the APA.

The judgment of the Court of Appeals for the Eighth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–290

_____

## UNITED STATES ARMY CORPS OF ENGINEERS, PETITIONER *v.* HAWKES CO., INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[May 31, 2016]

JUSTICE KENNEDY, with whom JUSTICE THOMAS and JUSTICE ALITO join, concurring.

My join extends to the Court's opinion in full. The following observation seems appropriate not to qualify what the Court says but to point out that, based on the Government's representations in this case, the reach and systemic consequences of the Clean Water Act remain a cause for concern. As JUSTICE ALITO has noted in an earlier case, the Act's reach is "notoriously unclear" and the consequences to landowners even for inadvertent violations can be crushing. See *Sackett* v. *EPA*, 566 U. S. \_\_\_, \_\_\_ (2012) (concurring opinion) (slip op., at 1).

An approved Jurisdictional Determination (JD) gives a landowner at least some measure of predictability, so long as the agency's declaration can be relied upon. Yet, the Government has represented in this litigation that a JD has no legally binding effect on the Environmental Protection Agency's (EPA) enforcement decisions. It has stated that the memorandum of agreement between the EPA and the Army Corps of Engineers, which today's opinion relies on, does not have binding effect and can be revoked or amended at the Agency's unfettered discretion. Reply Brief 12; Tr. of Oral Arg. 16. If that were correct, the Act's ominous reach would again be unchecked by the limited relief the Court allows today. Even if, in an ordinary case,

an agency's internal agreement with another agency cannot establish that its action is final, the Court is right to construe a JD as binding in light of the fact that in many instances it will have a significant bearing on whether the Clean Water Act comports with due process.

The Act, especially without the JD procedure were the Government permitted to foreclose it, continues to raise troubling questions regarding the Government's power to cast doubt on the full use and enjoyment of private property throughout the Nation.

# SUPREME COURT OF THE UNITED STATES

No. 15–290

UNITED STATES ARMY CORPS OF ENGINEERS, PETITIONER *v.* HAWKES CO., INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[May 31, 2016]

JUSTICE KAGAN, concurring.

I join the Court's opinion in full. I write separately to note that for me, unlike for JUSTICE GINSBURG, see *post,* at 1 (opinion concurring in part and concurring in judgment), the memorandum of agreement between the Army Corps of Engineers and the Environmental Protection Agency is central to the disposition of this case. For an agency action to be final, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett* v. *Spear*, 520 U. S. 154, 178 (1997). As the Court states, the memorandum of agreement establishes that jurisdictional determinations (JDs) are "binding on the Government and represent the Government's position in any subsequent Federal action or litigation concerning that final determination." Memorandum of Agreement §§IV–C–2, VI–A; *ante*, at 6 (majority opinion). A negative JD thus prevents the Corps and EPA—the two agencies with authority to enforce the Clean Water Act—from bringing a civil action against a property owner for the JD's entire 5-year lifetime. *Ante*, at 6–7, and n. 3. The creation of that safe harbor, which binds the agencies in any subsequent litigation, is a "direct and appreciable legal consequence[ ]" satisfying the second prong of *Bennett*. 520 U. S., at 178.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–290

_____

## UNITED STATES ARMY CORPS OF ENGINEERS, PETITIONER *v.* HAWKES CO., INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[May 31, 2016]

JUSTICE GINSBURG, concurring in part and concurring in
the judgment.

I join the Court's opinion, save for its reliance upon the
Memorandum of Agreement between the Army Corps of
Engineers and the Environmental Protection Agency.
*Ante*, at 6–7, and n. 3 (construing the memorandum to
establish that Corps jurisdictional determinations (JDs)
are binding on the Federal Government in litigation for
five years). The Court received scant briefing about this
memorandum, and the United States does not share the
Court's reading of it. See Reply Brief 12, n. 3 (memoran-
dum "does not address mine-run Corps jurisdictional
determinations of the sort at issue here"); Tr. of Oral Arg.
7 (same); *id.,* at 9 (reading of the memorandum to estab-
lish that JDs have binding effect in litigation does not
"reflec[t] current government policy"). But the JD at
issue is "definitive," not "informal" or "tentative," *Abbott
Laboratories* v. *Gardner*, 387 U. S. 136, 151 (1967), and
has "an immediate and practical impact," *Frozen Food
Express* v. *United States*, 351 U. S. 40, 44 (1956). See
also *ante*, at 7–8.\* Accordingly, I agree with the Court

_____

*\*Bennett* v. *Spear*, 520 U. S. 154, 178 (1997), contrary to JUSTICE
KAGAN's suggestion, *ante,* at 1, (concurring opinion) does not displace or
alter the approach to finality established by *Abbott Laboratories* v.
*Gardner*, 387 U. S. 136, 149–151 (1967), and *Frozen Food Express* v.

that the JD is final.

---

*United States*, 351 U. S. 40, 44 (1956).  *Bennett* dealt with finality quickly, and did not cite those pathmarking decisions.