**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**December 22, 2022**

_____

**Christopher M. Wolpert**
**Clerk of Court**

MERIT ENERGY COMPANY, LLC;
MERIT ENERGY OPERATIONS I, LLC,

      Plaintiffs - Appellants/Cross-
      Appellees,

v.

DEBRA HAALAND, in her official
capacity as Secretary of the Interior; U.S.
OFFICE OF NATURAL RESOURCES
REVENUE,

      Defendants - Appellees/Cross-
      Appellants.

Nos. 21-8047 and 21-8048
(D.C. No. 2:20-CV-00032-SWS)
(D. Wyo.)

_____

## ORDER AND JUDGMENT[*]

_____

Before **TYMKOVICH**, **KELLY**, and **MATHESON**, Circuit Judges.

_____

Plaintiff-Appellants/Cross-Appellees Merit Energy Co., LLC and Merit

Energy Operations I, LLC (collectively "Merit") own two oil leases on tribal land.[1]

Merit appeals from the district court's finding that the Department of the Interior's

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] We note that one of Merit's leases, the "Steamboat Butte" lease, is set to expire on December 31, 2022. IV Aplt. App. 633. Merit's other lease, the "Circle Ridge" lease, expired on December 31, 2020, and was not renewed by Merit. III Aplt. App. 601, 605; see Aplee. Reply Br. at 11–12.

Indian oil major portion regulation, 30 C.F.R. § 1206.54 (2015), which contains a formula to calculate royalties due for oil leases on tribal land, is consistent with the royalty payment provisions in two of their oil leases. Defendant-Appellees/Cross-Appellants Secretary of the Interior Debra Haaland and the U.S. Office of Natural Resource Revenue (ONRR) (collectively "the Agency") cross-appeal from the district court's findings that (1) the case is ripe and (2) the 10% cap on adjustments within the Agency's royalty payment formula in the Regulation was arbitrary and capricious. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm.

### Background

This appeal concerns two of Merit's oil leases, the "Steamboat Butte" and "Circle Ridge" leases, located on the Wind River Reservation in Wyoming. Merit pays royalties on the oil it produces, saves, or sells based on a percentage of the oil's value to the ONRR pursuant to its lease terms and subject to governing regulations. I Aplt. App. 190. Each lease contains a "major portion provision" which gives the Secretary discretion to calculate a "value" for royalty purposes to ensure the Tribes receive royalties consistent with market prices. Id. 190–91. The major portion provision, which is the same in both of Merit's leases, states:

> "Value" may, in the discretion of the Secretary, be calculated on the basis of the highest price paid or offered . . . at the time of production for the major portion of the oil of the same quality and gravity, and gas, and/or natural gasoline, and/or all other hydrocarbon substances produced, sold, and saved from the area where the Leased Premises are situated.

III Aplt. App. 607 (Circle Ridge Lease); IV Aplt. App. 651 (Steamboat Butte Lease).

2

The only term defined in the provision is "Leased Premises," defined as specific "tracts of land situated in the Reservation." III Aplt. App. 603; IV Aplt. App. 647.

The ONRR acts as a trustee for the Tribes and collects oil and gas royalties from companies operating on tribal land. II Aplt. App. 270–71. The ONRR promulgated regulations to calculate "value," as referred to in Merit's lease provisions. I Aplt. App. 191. Prior to 2015, the regulations corresponded to the language in Merit's leases. Id. 192. In 2011 and 2012, the Secretary began to reevaluate how to calculate "value" for the major portion of oil produced from Indian leases with a rulemaking committee. Id. 192–93; see II Aplt. App. 262. One of the committee's goals was to ensure the Tribes received maximum revenues under the government's trust responsibility, as well as increase clarity and certainty under the regulations for all parties. II Aplt. App. 271. The committee included representatives from the Tribes, the oil and gas industry, and the Agency. E.g., id. 262.

The ONRR published a proposed rule in 2014 and issued a final rule in 2015 (the "Regulation") calculating the "value" that royalties are based on. 30 C.F.R. § 1206.54(a) (2015). It defined "major portion price" as "the highest price paid or offered at the time of production for the major portion of oil produced from the same designated area for the same crude oil type." Id. § 1206.51. Under the new Regulation, oil companies, including Merit, are required to pay monthly royalties on the higher of their gross proceeds or the Index-Based Major Portion (IBMP) value for their oil type and location. Id. § 1206.54(a).

The calculation of the IBMP value is defined in the Regulation and published on a

3

monthly basis.  Id. § 1206.54(c).  It starts with the New York Mercantile Exchange ("NYMEX").  Id. §§ 1206.51, 1206.54.  NYMEX is a price index for sweet oil in Cushing, Oklahoma.  II Aplt. App. 310; 30 C.F.R. § 1206.51.  The royalty payment formula refers to "NYMEX CMA," meaning NYMEX "Calendar Month Average," which averages daily NYMEX prices over one month.  30 C.F.R. § 1206.51.  To account for differences in oil type and location, the NYMEX CMA price is adjusted each month using a Location and Crude Type Differential ("LCTD").  Id. § 1206.54(d)(2).  The LCTD is defined as "the difference in value between the NYMEX Calendar Monthly Average (CMA) and the value that approximates the monthly Major Portion Price for any given month, designated area, and crude oil type."  Id. § 1206.51.

To get to the IBMP value, the Agency first calculated an initial LCTD for each oil type and location.  The initial LCTD is based on the average of actual sales data of the prior 12 months for the major portion of each oil type and location.  Id. § 1206.54(d).  The major portion price is the price at which 25% plus one barrel of oil, by volume, is sold beginning with the highest prices.  Id. § 1206.54(d)(1)(i).  The major portion price reflects the 75th percentile of oil sold per month by volume.

Oil companies report and pay royalties on the higher of their gross proceeds or the IBMP value each month.  Id. § 1206.54(b).  When the percentage of oil sales by volume that report royalties as above the IBMP value diverges by plus or minus 3% from the 75th percentile of sales volume, compared to royalties reported at or below the IBMP value, the LCTD is adjusted the following month to reflect the change.  Id. § 1206.54(d)(2)(iii).  This adjustment to the LCTD is capped at 10%.  Id. § 1206.54(d)(2)(iii)(A)–(B).  Each

4

subsequent month the Agency may continue to adjust the LCTD by 10% if reported sales volumes and prices exceed the 3% variance until it is back within the 22–28% range.  Id. § 1206.54(d)(1)–(2).

Each month, the LCTD is applied to NYMEX to get the IBMP value, which is the ultimate value that royalties may be based on.  More specifically, the formula for the IBMP value is:

$$[(NYMEX\ CMA) \times (1 - LCTD)] = IBMP$$

Id. § 1206.54(c)(2).  The initial LCTD is calculated as:

$$\frac{[(\text{average of monthly NYMEX CMA for previous 12 months}) - (\text{average of monthly major portion prices for previous 12 months})]}{\text{average of monthly NYMEX CMA for previous 12 months}}$$

Id. § 1206.54(d).  The LCTD is different for each oil type and location, and there is one specifically for the Wind River Reservation.  II Aplt. App. 311; see 30 C.F.R. § 1206.51.  The Agency waited to calculate the IBMP value for Wind River until it had three payors in the area reporting prices of the same quality and type of oil, which the ONRR determined began in April 2017.  IV Aplt. App. 811.  The Agency made this determination in 2019, and published IBMP values for Wind River retroactively back to 2017.  See IV Aplt. App. 812–13; II Aplt. App. 292.

The Agency's regulations also state that to the extent a lease and the oil and gas regulations are inconsistent, the express lease terms control.  30 C.F.R. § 1206.50(c)(4).  Merit produces Wyoming asphaltic sour crude oil from its two Wind River leases, which is sold pursuant to the Western Canadian Select Index

5

(WCS), not NYMEX. I Aplt. App. 241. In its April 2019 report discussing Wind River, ONRR acknowledged a disconnect between WCS and NYMEX. IV Aplt. App. 814. The ONRR found that generally the LCTD accounted for the difference in price between WCS and NYMEX because the two indices moved in concert, but that there were months in which WCS and NYMEX moved separately. Id. 815. In those divergent months, which corresponded with the highest additional estimated royalties owed for the past pay period in 2017 and 2018, the ONRR found the Wind River LCTD had been adjusted by 10% as capped by the Regulation. Id.

After the ONRR began publishing IBMP values in 2019, it retroactively applied them to Merit back to 2017. When Merit reviewed the IBMP prices in May 2019, it determined that the IBMP value was dramatically higher than prices for Wyoming asphaltic sour crude oil in some months between April 2017 to May 2019 and contacted ONRR to raise the issue. I Aplt. App. 231, 241–44. Merit received notice on May 13, 2019, that it must value its oil on the higher of the IBMP or gross proceeds, and that the notice was not appealable. Id. 230. Because Merit believed that it should not be paying based on the IBMP value, it attempted to submit royalty payment on its gross proceeds in the fall of 2019. III Aplt. App. 422 (Brister Decl.). The Agency's accounting system does not allow a payment lower than the IBMP value to be submitted. See id.

On February 13, 2020, the ONRR issued an Order to Report and Pay requiring Merit to pay about $3.5 million in additional royalties for the period of April 2017 to December 2019. III Aplt. App. 572–80. The Order stated that failure to comply may

6

result in substantial civil penalties. Id. 573–74. Merit filed an administrative appeal of the Order on March 11, 2020, and posted a surety bond for about $3.9 million, including interest exceeding $400,000. Id. 423 (Brister Decl.). This administrative appeal remains pending.

Merit filed a petition for review of final agency action in district court on February 24, 2020. I Aplt. App. 3. Merit did not challenge the payments from April 2017 to December 2019 because those are the subject of the pending administrative appeal. Aplt. Br. at 10. Merit also does not facially challenge the Regulation and conceded that the IBMP calculation may work well for oil sold pursuant to NYMEX before the district court. See Aplt. Br. at 20; III Aplt. App. 415. Instead, Merit brought an as-applied challenge to the ongoing requirement that it pay current and future royalties under the Regulation, from January 2020 to present, seeking declaratory and injunctive relief. Aplt. Br. at 10–11; I Aplt. App. 14–15.

The district court determined that the case was ripe and the IBMP calculation was consistent with Merit's leases, but the 10% cap on adjustments to the monthly LCTD was arbitrary and capricious. I Aplt. App. 213. Merit filed a Rule 59(e) motion to amend the judgment and the Agency filed a Rule 60(b) motion for relief from judgment. Id. 7. In its Rule 59(e) motion, Merit argued that the LCTD formula remained arbitrary because it was not based on prices at the time of production even after removing the 10% cap on adjustments. III Aplt. App. 503–05. In its Rule 60(b) motion, the Agency argued there was new evidence, using one of Merit's other contracts for the same area in Wyoming, that Merit could base its prices on NYMEX.

7

Id. 529–32. The district court denied each post-judgment motion. I Aplt. App. 228. This appeal followed.

**Standard of Review**

We review the district court's opinion on agency action de novo and apply a "deferential" standard of review to the agency's decision. Wild Watershed v. Hurlocker, 961 F.3d 1119, 1126 (10th Cir. 2020). Under the APA, we only overturn agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Id. (citing 5 U.S.C. § 706(2)(A)). Agency action receives a presumption of validity, and the challenger bears the burden of showing the action is arbitrary and capricious. Id. The court considers the administrative record directly. Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric., 35 F.4th 1225, 1242 (10th Cir. 2022). Review is limited to the administrative record before the agency at the time the decision was made. N.M. Health Connections v. U.S. Dep't of Health & Hum. Servs., 946 F.3d 1138, 1161–62 (10th Cir. 2019).

We review the district court's determination of ripeness de novo. Peck v. McCann, 43 F.4th 1116, 1124 (10th Cir. 2022). Finally, we review a district court's denial of Rule 60(b) and Rule 59(e) motions for abuse of discretion. Jackson v. Los Lunas Cmty. Program, 880 F.3d 1176, 1191 (10th Cir. 2018) (Rule 60(b)); Hayes Fam. Tr. v. State Farm Fire & Cas. Co., 845 F.3d 997, 1004 (10th Cir. 2017) (Rule 59(e)).

**Discussion**

## A. Jurisdiction

There is a threshold jurisdictional issue on whether the district court's order is final. The district court, after determining the case was ripe and the IBMP value was reasonably calculated, remanded to the ONRR to "make appropriate adjustments to the LCTD, without limitation from any 10% cap, so that 'value' under these two leases more accurately reflects a major portion price for Wind River asphaltic sour crude oil at the time of production." I. Aplt. App. 213–14.

A remand from a district court to an administrative agency is ordinarily not appealable because it is not a final decision. C.W. by & through B.W. v. Denver Cnty. Sch. Dist., 994 F.3d 1215, 1222 (10th Cir. 2021). Merit argues this administrative remand rule does not apply in this case because we have a final order and removal of the 10% cap leaves no discretion for the ONRR to deviate from this finding or conduct further proceedings. Aplt. Jurisdictional Br. at 6–10. To determine finality in this context, we consider whether the agency action was essentially adjudicative, legislative, or nonadversarial, such as granting a license. Denver Cnty., 994 F.3d at 1220. The administrative-remand rule is most applicable if the underlying agency action is adjudicative, rather than policymaking based on agency expertise. See New Mexico ex rel Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 698 (10th Cir. 2009). The court also considers whether the district court order is analogous to a typical remand from a reviewing court to a lower court, and a district court's order is less similar to a typical

9

remand when an agency appears as an adversarial party defending its own actions. Am. Wild Horse Pres. Campaign v. Jewell, 847 F.3d 1174, 1184 (10th Cir. 2016).

The remand statement to "make appropriate adjustments" may imply an ability to make changes to the LCTD calculation beyond only removing the 10% cap. But this statement is an instruction, consistent with the ONRR's ongoing obligation to adjust the LCTD monthly under the Regulation, to adjust the LCTD "appropriately" without the 10% cap. It does not tell the ONRR to conduct further proceedings. See Aplee. Br. at 17. The underlying agency action is quasi-legislative because it arises from application of a promulgated rule based on agency expertise, and no adjudicative process will occur on remand. See New Mexico ex rel Richardson, 565 F.3d at 698. An additional factor pointing to finality is the agency appears as a party and not as an entity resolving disputes between other private parties. Thus, this order is not similar to a typical remand.

The district court order effectively ends the litigation on the merits and its findings will not be changed on remand to the ONRR. Because the Order on Petition is final, we have jurisdiction under 28 U.S.C § 1291.

## B. Ripeness

The Agency appeals from the district court's finding of ripeness. To determine ripeness, the court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hosp. Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003). The Agency and the district court framed the issue as about prudential ripeness, rather than Article III ripeness. See id.

### 1. Fitness of the Issues

The fitness inquiry asks whether the question presented is purely legal; whether the agency action is final; and whether "further factual development would 'significantly advance our ability to deal with the legal issues presented.'" Id. at 812 (quoting Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 82 (1978)).  We also consider if (1) "judicial intervention would inappropriately interfere" with further agency action and (2) the court would benefit from more factual development.  Wyoming v. Zinke, 871 F.3d 1133, 1141–1142, 1141 n.2 (10th Cir. 2017) (quoting Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior, 728 F.3d 1229, 1234–35 (10th Cir. 2013)).[2]  A claim is not ripe if it rests on future events that may not occur.  Id. at 1142.  The Agency does not contest that the question of whether the Regulation is consistent with Merit's leases is purely legal, which favors a finding of ripeness.  See Aplee. Br. at 30.

### a. Finality of Agency Action

An agency action is final when it represents the consummation of the agency decisionmaking process and determines the parties' rights or obligations or creates legal consequences.  U.S. Army Corps. of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016).

---

[2] The Tenth Circuit has also stated the ripeness test as four factors: whether a legal issue is presented, the agency action is final, the action has a direct impact on petitioner, and resolution will assist the agency in effective enforcement.  Farrell-Cooper, 728 F.3d at 1235 n.3.  Farrell-Cooper clarifies that this list "essentially includes the same considerations" as asking whether (1) judicial intervention would interfere with administrative action and (2) the court would benefit from further factual development.  Id.

Parties do not need to wait for enforcement proceedings before challenging final agency action if such proceedings risk serious civil or criminal penalties. Id. at 600. Courts take a "pragmatic" approach to finality. Id. at 599. Here, the Agency concedes that the Regulation itself is final, but argues this only supports a facial rather than as-applied challenge because Merit does not otherwise show the Agency has applied the Regulation against it. Aplee. Reply Br. at 3–5.

The Agency argues that under Mobil Exploration & Producing U.S., Inc. v. Department of the Interior, 180 F.3d 1192, 1199 (10th Cir. 1999), finality requires that royalties are owed after an audit, and that because no audit occurred here there is no final decision with respect to ongoing and future payments. Aplee. Reply Br. at 6. The Agency notes companies might circumvent the administrative process if a mere requirement to pay royalties is a final decision. Id. To be sure, the May 2019 notice indicates that ONRR may conduct a future audit, similar to the letter at issue in Mobil, 180 F.3d at 1198. I Aplt. App. 50. However, the May 2019 notice is unappealable and states Merit "must" comply with the Regulation. This is unlike Mobil, where an agency's letter postponed the determination of legal obligations until after an audit was conducted. See 180 F.3d at 1195, 1198. Merit's obligations were determined, the decision is unappealable, and noncompliance risks civil penalties.

Even if final, an agency action is reviewable only if there are no adequate alternatives to APA review in court. Hawkes Co., 578 U.S. at 600. Merit argues that the pending administrative appeal is an inadequate alternative and futile because the Secretary's position is clear. Aplt. Reply Br. at 20–22. Once that appeal is decided, it is

12

followed by two more levels of appeal to the ONRR Director and the Interior Board of Land Appeals ("IBLA"). Id. at 20–21. Decisions of the ONRR Director and the IBLA may be subject to the Secretary's review, whose position is definitive that this Regulation applies to Merit and who retains discretion to alter an IBLA decision even if the IBLA found for Merit. Id. at 16–17, 20 (citing 43 C.F.R. § 4.5). The Agency's position is definitive such that seeking separate administrative review of payments from 2020 to the present is futile. Therefore, this is a final agency action.

### b. Pending Administrative Appeal

Next, deciding the legal question of whether the Regulation is consistent with Merit's leases may determine the outcome of the pending administrative appeal. But the outcome of the administrative appeal only affects royalties through December 2019. Even if Merit prevails in the administrative action, it may not alter Merit's continuing obligation to comply with the Regulation. See Aplee. Br. at 25. Merit cannot obtain review for ongoing payments without complete nonpayment so that the Agency will issue an Order to Pay, which would then be appealable, because the ONRR system does not accept payments less than the IBMP value. III Aplt. App. 422 (Brister Decl.); see II Aplt. App. 327. Merit's choice to comply rather than risk penalties does not permit review of any payments made after January 2020 since no appealable Order has been or will be issued. See 30 C.F.R. § 1241.70–71 (2016) (calculating possible civil penalties, including interest on any underlying underpayment). These countervailing considerations weigh slightly in favor of the Agency.

### c.  Abstract Harm and Benefit of Further Factual Development

Lastly, the Agency argues that harm to Merit is contingent on events that may not happen and an opinion from this court would be merely advisory.  Aplee. Br. at 30–32.  Without going outside the administrative record, Merit has a Hobson's choice because ONRR's system will not accept payments less than the higher of the IBMP value or gross proceeds, meaning Merit cannot trigger review or suspend its obligation to pay without complete nonpayment and risk of civil fines.  Aplt. Br. at 11; Aplt. Reply. Br. at 19.  This shows the harm to Merit is not speculative.  See Frozen Food Express v. United States, 351 U.S. 40, 44 (1956) (finding agency order warning carriers who do not have Commission authority to transport commodities that they risk civil and criminal penalties is not abstract).[3]

Therefore, all considerations except for possible interference with the ongoing administrative process weigh in favor of judicial review.  Despite the pending administrative appeal, given that the instant case involves only payments made beginning in January 2020 and Merit has no other ability to trigger judicial review of

---

[3] The Agency also argues that new evidence shows one of Merit's other contracts uses NYMEX prices, not WCS, indicating the case would benefit from further factual development by the administrative agency.  Aplee. Br. at 26–28.  The Agency raised this claim in its Rule 60(b) motion, and we review the district court's denial of that motion for abuse of discretion.  III Aplt. App. 529.  The district court did not abuse its discretion by determining there was no need for further factual development because its finding of ripeness was not based on differences between NYMEX and WCS prices.  I Aplt. App. 227.  Moreover, the Agency's speculation on what might be found in the administrative process has no impact on the legal question of whether the Regulation is consistent with the lease terms.  See Aplt. Reply Br. at 26–27.  This court will not be in a better position later to address this legal issue.  See Duke Power Co., 438 U.S. at 82.

those payments, the issues are properly before us.

### 2. Hardship

Courts consider whether withholding review would create strictly legal adverse effects which would be suffered by the party if the case is not decided. Zinke, 871 F.3d at 1142. The court looks for a "direct and immediate dilemma." Id. at 1143 (quoting Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012)). Adverse effects exist if "absent judicial review and while the appeal is pending, [the party] would need to comply with the challenged agency regulation." Id. Cases have recognized two instances where hardship is significant: (1) significant financial or other costs and (2) when the defendant took concrete action that threatened to or already did impair the plaintiff's interests. Id.

A claim may be ripe where administrative action directly produces a harmful change in a party's business conduct. Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734, 742–43 (10th Cir. 1982) (citing Frozen Food Express, 351 U.S. 40). The Agency argues that an increase in monetary payments to comply with a facially valid Regulation, without other impact on Merit's business practices and when Merit can later recoup overpayment, is not sufficient hardship. Aplee. Br. at 34; Aplee. Reply Br. at 10. Merit contends that possible recoupment does not ameliorate the hardship and still would not allow it to recover lost interest. Aplt. Reply Br. at 24.

In Rocky Mountain, the court discredited the argument that harm does not occur until the denial of an administrative appeal. 696 F.2d at 741. There, the court described the harm as "investment decisions forced" by the Department of the Interior's policy and irreparable financial harm through the implementation of

regulations causing loss of previously invested money. Id. at 742. The Rocky Mountain court contemplated that if withholding judicial review requires a party to risk hundreds of thousands of nonrecoverable dollars to gain judicial review, then the case is ripe. Id. at 743 n.11. Moreover, Merit has no procedural mechanism to obtain a stay of enforcement because there is not an order relating to the payments made after January 2020. See Farrell-Cooper, 728 F.3d at 1237; 30 C.F.R. § 1243.4(a). Merit's administrative appeal of the Agency's 2020 Order to Report and Pay and post of a bond to suspend its enforcement is limited to payments made prior to January 2020. Delay in review leads to hardship because Merit is subject to financial harm by overpayment or the risk of civil penalties in order to otherwise obtain review. Thus, Merit has suffered hardship. We conclude the case is ripe.

## C. Whether the Regulation is Consistent with Merit's Leases

Turning to the next issue, 30 C.F.R. § 1206.50(c)(4) states that if the regulations are inconsistent with an express provision of an oil and gas lease, then the lease provision governs to the extent of the inconsistency. Merit argues that there is a conflict between lease terms and the Regulation, so the lease terms control and the Secretary's determination otherwise is arbitrary and capricious. Aplt. Br. at 23–24 (citing 30 C.F.R. § 1206.50(c)(4)). The Agency agrees that if there is inconsistency then the lease controls, but contends there is no inconsistency. Aplee. Br. at 35.

An agency decision is arbitrary and capricious when it (1) relies on factors which Congress did not intend it to consider, (2) entirely fails to consider an important aspect of the problem, (3) offers an explanation that runs counter to the evidence, or (4) is so

16

implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Wild Watershed, 961 F.3d at 1126.  An agency's trade-off of negative short-term consequences for long-term benefits is not arbitrary or capricious when supported by detailed analysis.  Id. at 1135.  Merit's leases each give the Secretary discretion to calculate 'value' based on the highest price paid or offered "at the time of production for the major portion of the oil of the same quality and gravity . . . from the area where the Leased Premises are situated."  III Aplt. App. 607 (Circle Ridge Lease); IV Aplt. App. 651 (Steamboat Butte Lease).

The first lease provision at issue is that the Secretary has discretion to calculate value on the basis of "the highest price paid or offered."  Merit argues that the administrative record does not show that the Agency considered the difference between WCS and NYMEX prices or that Wyoming asphaltic crude oil was sold pursuant to WCS when promulgating the Regulation, and that failure to do so was an arbitrary exercise of discretion.  Aplt. Br. at 29.  Merit argues that the Secretary first considered WCS in April 2019, four years after adopting the Regulation, revealing nine months of disconnect between NYMEX and WCS prices.  Id. at 30–31; cf. IV Aplt. App. 815.  The administrative record shows that the rulemaking committee considered various indices and challenges in a May 2012 meeting, but not WCS specifically.  E.g., II Aplt. App. 264–65, 270 ("Need to determine whether NYMEX is the correct starting point, and how much you would discount.  Other options could be Brent (world market) or Louisiana Sweet.").

The rulemaking committee later considered Wind River directly to determine

17

methodology related to the major portion price.  Id. 295–97.  This discussion, from an April 2013 meeting, shows the committee knew Wind River produced predominantly asphaltic sour oil and a location adjustment was likely needed.  Id. 297.  The April 2013 meeting also discussed using NYMEX as the starting point for an index-based major portion price.  Id. 297.  The Agency in June 2013 considered different indices (again, though not WCS), oil types, and locations such that it was not arbitrary to use NYMEX after concluding that most Indian oil is sold pursuant to NYMEX.  Id. 300 ("In the future, if another benchmark (e.g., Brent) is used more frequently, the Index Price for the formula could be changed.").  Therefore, the Agency did not entirely fail to consider important aspects of the problem.

The second lease provision is "at the time of production."  Aplt. Br. at 26.  Merit argues that this means the month of production.  Id. at 33–34.  Further, Merit argues that historically the Secretary published major portion prices after the month the royalty was paid and then adjusted retroactively, which the Secretary continues to do for Indian gas leases and also should do for Wind River.  Aplt. Reply Br. at 8.  Lastly, Merit argues that because the Secretary requires the reporting of either the higher of the IBMP value or gross proceeds, Merit cannot report actual sales prices so that the LCTD is adjusted without consideration of actual prices.  Id. at 8–9.  The Agency argues that time of production, with the 10% cap on LCTD adjustments, relies on a reasonable three-month period of past data because the Agency does not have real-time data.  Aplee. Br. at 37–38; see 30 C.F.R. § 1206.54(d)(2).

The rulemaking committee considered a similar model to the Indian gas system.  II

18

Aplt. App. 269.  The committee found that a retroactive adjustment approach was not preferable because the government wanted to distribute proper revenues to the Tribes sooner to fulfill its trust responsibilities to the Tribes.  Id. 271.  The rulemaking committee also considered the consequences of not reporting gross proceeds and lacking that information to serve as a safety net to judge other values.  Id. 301.  Basing the LCTD formula on the prior three months of data, but still publishing the IBMP monthly, reflects the time delay in reporting because significant volumes of oil sales are not reported by the end of the month.  See 80 Fed. Reg. 24794, 24801 (May 1, 2015).  The Agency did not entirely fail to consider important aspects of the issue.  The use of past, but recent, data is a reasonable exercise of the Secretary's discretion and not inconsistent with "time of production," particularly when that term is not defined in the lease.

The third and fourth lease provisions are highest price for the "major portion of the oil of the same quality and gravity" from "the same area where the Leased Premises are situated."  Aplt. Br. at 26.  As noted, "Leased Premises" are defined in the leases as specific "tracts of land situated in the Reservation."  III Aplt. App. 603; IV Aplt. App. 647.  These terms are facially inconsistent with part of the royalty payment formula: NYMEX does not reflect the actual price of asphaltic sour crude oil from the Wind River Reservation.  However, NYMEX is adjusted by location and type using the monthly LCTD because the rulemaking committee acknowledged differences in oil type and location.  II Aplt. App. 310–12.  The initial LCTD calculation is based on 12 months of actual pricing data specific to Wind River and then adjusted monthly to continue to reflect that area and type.  The Agency waited to calculate the IBMP value for Wind

River until it had three payors of the same quality and type of oil, which is why the IBMP

value for Wind River was not published until 2019. See IV Aplt. App. 812–13. The

royalty payment formula, viewed as a whole and looking at the end result IBMP value, is

not inconsistent with Merit's lease provisions.

Therefore, using NYMEX adjusted by specific location and type is consistent with

Merit's leases and within the Secretary's discretion, as explicitly provided in the leases,

to calculate "'value' . . . on the basis of" the highest price paid or offered at the time of

production for the "major portion" of the same type of oil from the area where Wind

River is located.

### D. Whether the 10% Cap is Consistent with Merit's Leases

Reviewing the district court's decision de novo, we apply the arbitrary and

capricious standard to the part of the royalty payment formula which provides a 10%

cap on adjustments to the monthly LCTD. The Agency argues that including a 10%

cap is not inconsistent with "at the time of production" in Merit's leases because

Interior receives a complete set of prices two months after production and then

calculates the prices for the upcoming month, with no way to use real-time data.

Aplee. Br. at 37.

The administrative record shows that the royalty payment formula is designed

so that the IBMP value reflects market prices for each oil type and location. II Aplt.

App. 310–11. The only justification the Agency presents for restricting adjustments

to the monthly LCTD to 10% is avoiding volatility. The Agency's argument that the

major portion price is intended to be captured over time is supported by the

rulemaking committee's Final Report, which describes steady adjustments to the LCTD by 10% until within the acceptable range.  II Aplt. App. 312.

However, and as the district court found, this means that when prices shift from month to month, the IBMP value will not reflect Wyoming asphaltic sour crude oil prices "at the time of production" because it by definition is incrementally adjusted.  I Aplt. App. 211–12.  The administrative record does not show a reason for why the Agency chose a 10% cap as opposed to another number, nor indicate how a cap is consistent with the parameters of the Secretary's discretion to calculate value under the lease terms.  Moreover, the Agency's April 2019 report on Wind River, before notifying Merit it was subject to the new Regulation in May 2019, showed that the months where WCS and NYMEX moved separately resulted in the largest additional royalties even when the LCTD was adjusted by 10%.  I Aplt. App. 229; IV Aplt. App. 814–15.  Although the Agency is entitled to deference and has discretion to calculate "value" under Merit's leases, the decision to cap the adjustment to the monthly LCTD at 10% was not considered in the administrative record and is arbitrary.  See 80 Fed. Reg. 24,794, 24,796–97 (May 1, 2015) (reiterating, in response to public comment that the 10% cap is arbitrary, that the committee's limitation was to "prevent drastic swings in the LCTD from month to month.").  The 10% cap is inconsistent with the term "time of production" in Merit's two leases.

**Conclusion**

21

The Agency's royalty payment formula itself is consistent with Merit's leases and within the Secretary's discretion as explicitly provided by the lease terms. However, the 10% cap on adjustments to the monthly LCTD within the formula is arbitrary and capricious and inconsistent with Merit's lease provisions.[4] To the extent of the inconsistency, Merit's lease provisions control. 30 C.F.R. § 1206.50(c)(4).

AFFIRMED.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

---

[4] Merit also argues the district court erroneously denied Merit's request to require ONRR to use prices from the current month to calculate the LCTD adjustment. Aplt. Br. at 40. This argument is the same as the previous discussion of the "time of production," but Merit presents it again as an "in alternative." Id. at 42. Merit raised this argument in its Rule 59(e) motion to amend, and as such the district court's resolution of this issue is reviewed for abuse of discretion. See III Aplt. App. 503–05.

The district court denied Merit's motion because it had already considered and rejected Merit's argument that "time of production" was limited to meaning the month of production. I Aplt. App. 225–27. Thus, Merit did not satisfy the high standard for amending judgment. The district court did not abuse its discretion by determining it had already considered and rejected Merit's claim. Even if this argument was raised in Merit's initial district court briefing and subject to de novo review, it is not arbitrary to use older, yet recent, data to determine "time of production" when it is not feasible to use real time prices due to reporting delay. See supra Part C.